James H.M. Sprayregen (JS-7757)
Lena Mandel (LM-3769)
KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

and

Matthew N. Kleiman (MK-3828)
Anup Sathy (AS-4915)
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Counsel for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11
                                                            :
TELIGENT, INC., et al.,[1]                                  :    Case No. 01-_____ (____)
                                                            :    Jointly Administered
                     Debtors.                               :
-------------------------------------------------------------------x

# MOTION FOR AUTHORITY TO PROVISIONALLY PAY
# IN THE ORDINARY COURSE OF BUSINESS
# PREPETITION CLAIMS OF ESSENTIAL TRADE CREDITORS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (the "Motion") seeking entry of an order, under 11 U.S.C. § 105(a), authorizing provisional payment in the ordinary course of business of certain prepetition claims of essential trade creditors. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors are the following entities: Teligent, Inc.; Teligent Services, Inc.; American Long Lines, Inc.; Association Communications, Inc.; Auctel, Inc.; BackLink, L.L.C.; Easton Telecom Services, Inc.; Executive Conference, Inc.; FirstMark Communications, Inc.; InfiNet Telecommunications, Inc.; JTel, L.L.C.; KatLink, L.L.C.; OMC Communications, Inc.; Quadrangle Investments, Inc.; Telecommunications Concepts, Inc.; Teligent Communications, L.L.C.; Teligent License Co. I, L.L.C.; Teligent License Co. II, L.L.C.; Teligent of Virginia, Inc.; Teligent Professional Services, Inc.; and Teligent Telecommunications, L.L.C.

**Jurisdiction**

1. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

2. The statutory basis for the relief requested herein is section 105(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code").

**Background**

3. On the date hereof (the "Petition Date"), the Debtors commenced cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. No trustee or examiner has been appointed in these chapter 11 cases, and no committees have been appointed or designated.

5. Teligent, Inc. is the ultimate parent corporation to the twenty domestic subsidiaries, all of whom are debtors and debtors in possession herein (the "Debtor Subsidiaries"), as well as to many non-debtor foreign subsidiaries (the "Foreign Subsidiaries"[2] and, collectively with the Debtors, "Teligent").

6. Teligent is in the business of providing telecommunication services in the form of local and long distance telephone, high-speed data, and Internet access service through its SmartWave™ local networks in 43 major domestic markets and internationally. The SmartWave™

---

[2] The principal Foreign Subsidiaries are: Teligent International Ltd. (Bermuda), Teligent Canada, Inc. (Canada), Associated Communications Europe S.a.r.l. (Luxembourg), TGNT France SA (France), BLR Services SAS (France), Associated Communications Luxembourg S.a.r.l. (Luxembourg), Blescare – 98 S.L. (Spain), Banda 26, S.A. (Spain), Teligent Americas Ltd. (Bermuda), Teligent do Brasil Holding Ltda. (Brazil), Teligent do Brasil Ltda. (Brazil), Argentina Telecom Holdings Ltd. (Cayman Islands), Teligent Asia Pacific Ltd. (Bermuda), CCT – Teligent CO., Limited (Hong Kong), TGNT (UK) Limited (UK), Associated Communications Deutschland (Germany), and ArcTel GmbH & Co, KG (Germany).

local networks combine advanced wireless technologies with traditional wireline technologies to provide an efficient method for the delivery of broadband services to small and medium size business customers. This delivery is effected by the use of "fixed wireless" technology, which provides for the wireless transmission of voice and data traffic directly to a customer's premises, thus obviating the need for the expensive and disruptive deployment of fiber optic cable.

7. As of April 30, 2001, Teligent had approximately 35,000 customers. For the fiscal year ended December 31, 2000, Teligent, on a consolidated basis, reported revenues of approximately $152,072,000 and net losses of approximately $807,986,000. As of December 31, 2000, Teligent's consolidated books and records reflected assets totaling approximately $1,209,476,000 and liabilities totaling approximately $2,170,061,000. As of the Petition Date, the Debtors have approximately 1480 full-time and part-time employees.

8. As of the Petition Date, Teligent, Inc. is obligated in the aggregate amount of approximately $800,000,000, pursuant to that certain secured credit facility, originally dated as of July 2, 1998 (as amended, modified and supplemented from time to time through and including the Petition Date, and inclusive of all collateral, guarantee and other documents executed in connection with the secured credit facility, the "Prepetition Credit Facility"), among Teligent, Inc., as borrower, and The Chase Manhattan Bank, as administrative agent, and the lender parties thereto (collectively, the "Prepetition Lenders"). Under the terms of the Prepetition Credit Facility, Teligent, Inc.'s obligations to the Prepetition Lenders are secured by a pledge of the stock of substantially all of the Debtor Subsidiaries and by liens on and security interests in substantially all of the domestic assets of the Debtors.

9.    In November 1997, Teligent, Inc. issued $300 million of 11 1/2% senior notes due 2007 (the "Senior Notes") pursuant to that certain indenture dated November 26, 1997, between Teligent, Inc., as issuer, and First Union National Bank, as trustee (the "Indenture Trustee").

10.    Under a 1998 exchange offer, Teligent, Inc. issued $440 million of 11 1/2% Series B Discount Notes due 2008 (the "Discount Notes"), in exchange for certain previously issued securities. The Discount Notes are governed by that certain Indenture dated February 20, 1998, between Teligent, Inc., as issuer, and the Indenture Trustee.

11.    In April 2001, IDT Corporation acquired a 29.2% ownership interest in Teligent, Inc. previously held indirectly by Liberty Media Corporation. As a result, IDT Corporation is currently the largest shareholder of Teligent, Inc.

12.    The nature of Teligent's business requires significant capital expenditures to finance the deployment of services, including purchasing and installing equipment, operating the network, obtaining spectrum licenses, and hiring and retaining employees. However, the rapid expansion of Teligent's business and the associated expenditures has resulted in operating losses and negative cash flow in every year since Teligent's inception in 1997.

13.    Teligent, Inc. received waivers from the Prepetition Lenders since December 31, 2000, relating to certain covenants in the Prepetition Credit Facility, including covenants regarding the achievement of certain financing and performance targets and the maintenance of certain financial ratios. However, the most recent waiver from the Prepetition Lenders expires on May 21, 2001. Based on the Debtors' financial condition, liquidity and prospects, the Debtors have determined that a financial restructuring of their businesses through a chapter 11 process is necessary and appropriate.

**Essential Trade Creditors**

14. The Debtors purchase specialized products and services from certain vendors, some of them sole-source providers, who are unaffiliated with the Debtors with whom it is critical Debtors continue doing business with (collectively, the "Essential Trade Creditors").

15. The Debtors call upon many of these Essential Trade Creditors daily to provide specialized services in connection with: (a) maintaining and installing the Debtors' enterprise system software (e.g., software that is crucial functions such as billing, security, usage collection, trouble ticketing, and customer order entry); (b) maintaining and installing the Debtors' extensive telecommunications network; and (c) maintaining and installing the Debtors' equipment.

16. Ongoing maintenance and provision of such services by certain such Essential Trade Creditors is critical to maintaining the value of the Debtors' assets and preserving their value as a going concern. In some instances, such Essential Trade Creditor is the designer and/or manufacturer of the software and/or equipment at issue, and thus is uniquely qualified and skilled to maintain the software, equipment, or network component at issue. In other instances, the Essential Trade Creditor is highly skilled and experienced in dealing with the particular software, equipment, or network component, and cannot be practicably replaced.

17. Some Essential Trade Creditors are among only a handful of such suppliers in the world. Others offer products or services that are so far superior to those available elsewhere, that the Debtors cannot practicably replace such Essential Trade Creditors. If the Debtors lost the relationships with these Essential Trade Creditors, their ability to create future revenues would suffer greatly.

18. Other Essential Trade Creditors provide goods or services for a reduced cost. If the Debtors can benefit from future low costs, it may be prudent for the Debtors to pay the selected

Essential Trade Creditors their prepetition claims, provided that such vendors sell their goods or services at a reduced cost going forward.

19. By this Motion, the Debtors request the discretionary authority to pay, on the conditions set forth below and in the proposed order, the claims (the "Trade Claims") of Essential Trade Creditors for prepetition goods and services provided to the Debtors, up to an aggregate of $5 million (the "Trade Claims Cap").

20. The Debtors also request that all banks and other financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn on the Debtors' accounts to honor payments to Essential Trade Creditors, whether such checks were presented prior to or after the Petition Date, except to the extent that the Debtors and the applicable financial institution agreed prior to the Petition Date that an account on which the Debtors draw such checks could be closed.

## **Proposed Conditions to Receiving Payment**

21. The Debtors reserve the right to later seek Court authority to increase the Trade Claims Cap. To minimize the amount of payments required, the Debtors request authority to determine the identity of Essential Trade Creditors subsequent to the Petition Date. Identifying the Essential Trade Creditors now would likely cause such creditors to demand payment in full. When determining whether a creditor is an Essential Trade Creditor, the Debtors will consider, among other things, (a) whether the goods or services the creditor provides can be replaced, (b) whether failure to pay any particular prepetition Trade Claim will require the Debtors to incur higher costs for goods or services postpetition, and (c) whether failure to pay a particular Trade Claim will cause the Debtors to lose sales or future revenue in excess of the amount of such claim.

22.  The amount of the Essential Trade Creditors' estimated prepetition Trade Claims, accounting for any setoffs, other credits and discounts thereto, shall be mutually determined in good faith by each Essential Trade Creditor and the Debtors (but such amount shall be used only for the purposes of this Motion and shall not be deemed to constitute a claim allowed by the Court and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court).

23.  The Debtors propose to pay the Trade Claims of each Essential Trade Creditor that agrees to continue to supply goods or services to the Debtors on such Essential Trade Creditor's Customary Trade Terms.[3]  However, in determining the Trade Claims Cap, the Debtors were careful to include only such payments that the Debtors, in their best estimate, determined would be required at a <u>minimum</u> to continue the supply of critical goods and services as a condition of continued sales. It may also be necessary to pay certain Essential Trade Creditors a portion of such creditors' claim in return for the continued supply of critical goods and services – even if not on the Essential Trade Creditor's Customary Trade Terms.  The Debtors thus seek approval to enter into a separate agreement, at the Debtors' discretion, with each such Essential Trade Creditor on a case by case basis.

24.  If an Essential Trade Creditor later refuses (unless such refusal is based on the Debtors' failure to make timely payments subsequent to the Petition Date contrary to the Customary Trade Terms) to continue to supply goods or services to the Debtors on Customary Trade Terms during the pendency of these chapter 11 cases (or on such terms as were individually agreed to

---

[3] As used herein, "Customary Trade Terms" are defined as the normal and customary trade terms, practices and programs including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs in effect between such trade creditor and the Debtors on a historical basis for the period prior and up to the Petition Date or such other trade terms, practices and programs that are at least as favorable as those that were in effect during such time.

between the Debtors and such Essential Trade Creditor), then the Debtors may, in their discretion, and without further order of the Court, declare that (a) any payment of a Trade Claim made by the Debtors under the order granting this Motion shall be deemed to be a postpetition advance that the Debtors may recover from such Essential Trade Creditor in cash or in goods or services and (b) upon any such recovery by the Debtors, the Trade Claim of such Essential Trade Creditor paid after the Petition Date shall be reinstated in the amount so recovered.

25. To ensure that Essential Trade Creditors deal with the Debtors on Customary Trade Terms, the Debtors request authority, but not direction, to: (a) send a letter substantially in the form attached hereto as Exhibit A to the Essential Trade Creditors along with a copy of the order granting the Motion (Exhibit A shall constitute a "Trade Agreement" as used in the proposed order attached hereto); and (b) include on the check used to pay the Trade Claim of an Essential Trade Creditor, a legend substantially in the following form:

> By accepting this check, the payee agrees to the terms of the order of the U.S. Bankruptcy Court for the Southern District of New York, dated _____, 2001, in the Company's chapter 11 case (Case No. [_____]), entitled "Order Granting Debtors Authority for Provisional Payment of Prepetition Claims of Essential Trade Creditors" and submits to the jurisdiction of that Court for enforcement thereof.

26. The Debtors reserve their right to obtain written acknowledgment of the Customary Trade Terms of an Essential Trade Creditor before paying such creditor's Trade Claim, which written acknowledgment will be in the form of Exhibit B. If the Debtors request such acknowledgment, they may rely upon a confirming memorandum setting forth the Customary Trade Terms, whether received by telefax, telex, telegram, express mail, or by other customary modes of delivery. For those Essential Trade Creditors who have agreed to ship on other than Customary Trade Terms, the Debtors reserve the right to obtain written acknowledgment of such terms on a case by case

8

basis. The Debtors also reserve their right to contest any invoice of an Essential Trade Creditor under applicable non-bankruptcy law.

27. In the aggregate, payments to Essential Trade Creditors shall not exceed the Trade Claims Cap, unless otherwise ordered by the Court. The Debtors shall maintain a matrix summarizing for the period after the Petition Date (a) the name of each Essential Trade Creditor paid on account of its Trade Claims, (b) the amount paid to each Essential Trade Creditor on account of its Trade Claims, and (c) the goods or services provided by such Essential Trade Creditor.

## Basis for Relief Requested

### (1) The Court May Rely on its General Equitable Powers to Grant the Motion

28. The Debtors believe that payment of the Trade Claims owed to Essential Trade Creditors is a key to their successful restructuring. If this Motion is not granted, Essential Trade Creditors will have no incentive to continue to finance the Debtors on customary trade terms. Indeed, certain Essential Trade Creditors that suspected that the Debtors were contemplating filing bankruptcy petitions have gone so far as to require the Debtors to pay for their goods on a cash-in-advance or cash-on-delivery basis. Any further expansion of these activities by other Essential Trade Creditors would be highly detrimental to the Debtors, their estates and their creditors.

29. The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is clearly advantageous to the Debtors in that it allows the Debtors to maintain liquidity for operations. The Debtors believe that preserving working capital through the retention or reinstatement of traditional trade credit terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses. Conversely, a deterioration of trade credit and a disruption or cancellation of deliveries of goods and services would hinder the Debtors' operations and undermine their ability to restructure. Additionally, the

relief requested herein also may help to avert countless reclamation claims, suits and motions. Avoiding the time and expense of evaluating and litigating such claims will benefit the Debtors, their estates and their creditors.

30. Simply put, failure to pay prepetition Trade Claims owed to Essential Trade Creditors would damage the Debtors, their estates, their creditors and other parties in interest. The Debtors would lose an inexpensive existing source of financing. Indeed, failure to pay prepetition Trade Claims may result in Essential Trade Creditors ceasing to do business with the Debtors. Either of these occurrences would jeopardize the success of the Debtors' chapter 11 cases and undermine their restructuring.

31. The Court's general equitable powers are codified in section 105(a) of the Bankruptcy Code. Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)). Under section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992). The Debtors strongly believe the continuation of favorable trade terms and credit are imperative to the Debtors' restructuring, that the payment of the prepetition Trade Claims of Essential Trade Creditors is essential to assure such continuation and that the Court may exercise its equitable powers to grant the relief requested in this Motion.

### (2) The Court May Rely on the "Necessity of Payment" Doctrine to Grant the Petition Requested Herein

32. The "necessity of payment" doctrine further supports the relief requested in this Motion. The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." Ionosphere Clubs, 98 B.R. at 176; In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987); In re Columbia Gas System, Inc., 171 B.R. 189 (Bankr. D. Del. 1994). This doctrine is consistent with the paramount goal of chapter 11, *i.e.*, "facilitating the continued operation and rehabilitation of the debtor." Ionosphere Clubs, 98 B.R. at 176.

33. It is not uncommon for courts to authorize payments to vital suppliers and trade creditors. See, e.g., In re NSC Corp., et al., Case No. 00 B 13233 (PBC) (Bankr. S.D.N.Y. Aug. 7, 2000); In re United Artists Theatre Company, et al., Case No.00-3514 (Bankr. D. Del. Sept. 7, 2000); In re Penn Traffic Company, et al., Case No. 99-462 (PJW) (Bankr. D. Del. March 1, 1999) (critical vendor payments); In re Acme Steel Company, et al., Case No. 98-2179 (MFW) (Bankr. D. Del. Sept. 29, 1998) (critical vendor payments); In re Allis-Chalmers Corp., No. 87 B 11225 (Bankr. W.D. Pa. Aug. 24, 1987) (court authorizes debtor to pay prepetition warranty claims); In re Wilson Foods Corp., No. 83-01034A (Bankr. W.D. Okla. 1983) (debtor authorized to spend, in its discretion, a sum not to exceed $5 million in the aggregate to pay essential pre-chapter 11 obligations); see also Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir.), cert. denied, 325 U.S. 813 (1945) ("Let [the debtor] once be shut down, and it will lose much of its value . . . . Some priority [to the debtor's pre-petition suppliers] may be essential to preservation of the business.").

34. The Debtors also note that many of their Essential Trade Creditors are foreign vendors who provide parts and components essential for the Debtors' businesses that, in many cases,

11

are not available from any other source. Many, if not all, of such foreign creditors may refuse to deliver goods ordered before the Petition Date and to engage in any further business with the Debtors unless the Debtors' obligations to them are satisfied. Further, it is unlikely that such foreign creditors will forbear collection of their prepetition claims against the Debtors and their foreign branches and instead may seize or impound assets within their respective jurisdictions. Indeed, such foreign creditors may also invoke civil or criminal penalties against the employees or agents of the Debtors or of their foreign branches. While the automatic stay may technically prohibit such actions, any relief sought or obtained through the Bankruptcy Court would not be enforceable against the Debtors' foreign creditors, particularly those with infrequent contacts with the United States. See, e.g., In re Vessel Charters, Inc., Index No. 190-15899-260 (E.D.N.Y. Jan. 10, 1991); In re Pan Am Corp., Index No. 91B 10080-10087 (S.D.N.Y. Jan. 8, 1991); Ace Pecan Co. v. Granadex Int'l, Ltd. (In re Ace Pecan Co.), 143 B.R. 696 (Bankr. S.D.N.Y. 1992).

35.  Authority to pay the Essential Trade Creditors (up to the Trade Claims Cap) in the ordinary course of the Debtors' business is in the best interest of the Debtors' estates and creditors. Absent such payment, the value of the Debtors' estates is likely to suffer drastic diminution.

### Waiver of Memorandum of Law

36.  Because there are no novel issues of law presented herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Motion pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b).

### No Prior Request

37. No prior Motion for the relief requested herein has been made to this or any other court.

## Notice

38. Notice of this Motion has been given to (i) the United States Trustee, (ii) counsel to IDT Corporation, (iii) counsel to the Administrative Agent to the Prepetition Lenders, and (iv) the top thirty unsecured creditors of the Debtors, including the Indenture Trustee. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, (i) authorizing, but not directing, the Debtors to pay certain

Trade Claims of Essential Trade Creditors not to exceed the Trade Claims Cap, and (ii) granting such other and further relief as the Court deems appropriate.

| | |
|---|---|
| New York, New York<br>Dated: May 21, 2001 | Respectfully submitted,<br><br>KIRKLAND & ELLIS<br><br>/s/ Lena Mandel<br>James H.M. Sprayregen (JS-7757)<br>Lena Mandel (LM-3769)<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022<br>(212) 446-4800<br><br>and<br><br>KIRKLAND & ELLIS<br>Matthew N. Kleiman (MK-3828)<br>Anup Sathy (AS-4915)<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>(312) 861-2000<br><br>Counsel for the Debtors and Debtors in Possession |

## EXHIBIT A

**[INSERT DEBTOR ENTITY]**

_____, 2001

TO:   **[ Essential Trade Creditor]**
      **[Name]**
      **[Address]**

Dear Valued Supplier:

On [**INSERT**] (the "Petition Date"), Teligent, Inc. and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Cases" and the "Bankruptcy Court," respectively). On the Petition Date, the Debtors also requested the Bankruptcy Court's authority to pay certain suppliers in recognition of the importance of our relationship with such suppliers, and our desire that the Bankruptcy Cases not disrupt our excellent relationship with our valued and loyal suppliers. On [**INSERT**], 2001, the Bankruptcy Court entered an order (the "Order") authorizing us, under certain conditions, to pay prepetition claims of certain trade creditors that agree to the terms set forth below and to be bound by the terms of the Order. A copy of the Order is enclosed.

In order to receive payment on prepetition claims, each selected trade creditor must agree to continue to supply goods or services to the Debtors based on "Customary Trade Terms." In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs in effect between such trade creditor and the Debtors on a historical basis for the period prior and up to the Petition Date or such other trade terms, practices and programs that are at least as favorable as those that were in effect during such time.

For purposes of administration of this trade program as authorized by the Bankruptcy Court, the Debtors and you agree as follows:

1. The estimated balance of the prepetition trade claim (net of any setoffs, credits or discounts) (the "Trade Claim") that the Debtors will provisionally pay you is $_____.

2. You will provide open credit terms as follows (if more space is required, attach continuation pages): _____
_____
_____
_____

_____
_____
_____
_____.

3. The open trade balance or credit line that you will extend to the Debtors for shipment of postpetition goods is $ _____ (which shall not be less than the greater of the open trade balance outstanding: (a) on the Petition Date, _____, 2001, or (b) on normal and customary terms on a historical basis for the period prior and up to the Petition Date).

4. You agree that you shall not require a lump sum payment upon confirmation of a plan in the Bankruptcy Cases on account of any administrative expense priority claim that you may assert, but instead that such claims will be paid in the ordinary course of business after confirmation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Debtors.

5. In consideration for the payment described herein, you agree not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements entered into prior to the Petition Date, and that, to the extent you have obtained such a Lien, that you shall take whatever action necessary in order to remove such Lien.

6. You will hereafter extend to the Debtors all Customary Trade Terms (as defined in the Order).

Payment of your Trade Claim in the manner set forth in the Order may only occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtors. Your execution of this letter agreement and return of the same to the Debtors constitutes an agreement by you and the Debtors:

(i) to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Trade Claim set forth above;

(ii) that during the pendency of the Bankruptcy Cases, you will continue to supply the Debtors with goods or services pursuant to the Customary Trade Terms and that the Debtors will pay for such goods or services in accordance with Customary Trade Terms;

(iii) that you have reviewed the terms and provisions of the Order and that you consent to be bound by such terms;

    (iv)    that you will not separately seek payment for reclamation and similar claims outside of the terms of the Order unless your participation in the trade payment program authorized by the Order (the "Trade Payment Program") is terminated; and

    (v)    that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to you and that you will immediately repay to the Debtors any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

The Debtors and you also hereby agree that any dispute with respect to this letter agreement, the Order and/or your participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, do not hesitate to call **[insert name of responsible individual]** at **[insert telephone number]**.

    Sincerely,

    **[insert debtor entity]**

    By: _____
    Its: _____

Agreed and Accepted by:
**[Name of Trade Vendor]**

By: _____
Its: _____

Dated: _____

## EXHIBIT B

## ACKNOWLEDGMENT BY ESSENTIAL TRADE CREDITOR

**[Name of Essential Trade Creditor]** is in receipt of **[Name of Debtor]** orders (either written or verbal) (the "Orders") requesting shipment of **[describe requested goods by type, quantity and price]** (the "Goods") or delivery of services ("Services"). Such Orders have not been fulfilled as of **[Insert date]**. We hereby acknowledge and agree that shipment of the Goods or Services will be in accordance with Customary Trade Terms and the Order Granting Debtors Authority for Provisional Payment of prepetition Trade Claims of Essential Trade Creditors entered by the Court.

**[Name of Essential Trade Creditor]**

By: _____
Printed Name:
Title:

Date: _____

I:\Teligent\First days\FinalVersions\EssentialTrade\EssTradeMot-8signed.wpd