# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| Teligent, Inc., et al.,[1] | Case No. 01-12974 (SMB) |
| Debtors. | Jointly Administered |

## DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Matthew N. Kleiman (MK-3828)
Anup Sathy (AS-4915)
Scott R. Zemnick (SZ-5551)
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

James H.M. Sprayregen, P.C. (JS-7757)
Jonathan S. Henes (JH-1979)
Michael J. Frishberg (MF-5619)
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

September 3, 2002

---

[1]  The Debtors are the following entities: Teligent, Inc.; Teligent Services, Inc.; Xandu Shell Corp. (f/k/a American Long Lines, Inc.); Association Communications, Inc.; Auctel, Inc.; BackLink, L.L.C.; Winston Shell Corp. (f/k/a Easton Telecom Services, Inc.); Quincy Shell Corp. (f/k/a Executive Conference, Inc.); FirstMark Communications, Inc.; Sawyer Shell Corp. (f/k/a InfiNet Telecommunications, Inc.); JTel, L.L.C.; KatLink, L.L.C.; OMC Communications, Inc.; Quadrangle Investments, Inc.; Atlantis II Shell Corp. (f/k/a Telecommunications Concepts, Inc.); Teligent Communications, L.L.C.; Teligent License Co. I, L.L.C.; Teligent License Co. II, L.L.C.; Teligent of Virginia, Inc.; Teligent Professional Services, Inc.; and Teligent Telecommunications, L.L.C.

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

HISTORICAL BACKGROUND AND CHAPTER 11 CASES ...................................... 2
    A.   Historical Background of Debtors ...................................................................... 2
    B.   The Chapter 11 Cases ......................................................................................... 4
         1.   Commencement of Cases ........................................................................ 4
         2.   Cash Collateral Order ............................................................................. 4
    C.   Sale Efforts ......................................................................................................... 5
         1.   Sale of Core Retail Business .................................................................. 5
         2.   Sale of Enterprise Companies ................................................................ 7
         3.   Fixed Wireless Business ......................................................................... 7
    D.   Schedules and Administrative Claims Bar Date .............................................. 7
    E.   Plan and Disclosure Statement Process ............................................................ 8

VOTING STATUS ......................................................................................................... 10

ARGUMENT ................................................................................................................. 10
    I.     THE DEBTORS' PLAN SHOULD BE CONFIRMED ..................................... 10
    A.   The Plan Complies With The Applicable Provisions Of The Bankruptcy
        Code (Section 1129(a)(1)) ............................................................................... 10
         1.   The Plan Satisfies the Classification Requirements of 11 U.S.C. §
              1122 By Placing Only Substantially Similar Claims or Equity
              Interests in Each Class .......................................................................... 11
         2.   The Plan Satisfies the Requirements of 11 U.S.C. § 1123(a) ............... 12
    B.   The Debtors Have Complied Fully With The Applicable Provisions Of
        The Bankruptcy Code (Section 1129(a)(2)) .................................................... 14
    C.   The Debtors Have Proposed The Plan In Good Faith (Section 1129(a)(3)) ......... 14
    D.   The Plan Provides For Bankruptcy Court Approval Of Certain
        Administrative Payments (Section 1129(a)(4)) ................................................ 16
    E.   The Identity Of Certain Individuals Who Will Hold Positions Post-
        Confirmation Has Been Disclosed (Section 1129(a)(5)) ................................. 17
    F.   The Plan Does Not Require Governmental Regulatory Approval (Section
        1129(a)(6)) ....................................................................................................... 18
    G.   The Plan is in the Best Interests of Creditors and Equity Interest Holders
        (Section 1129(a)(7)) ......................................................................................... 18
    H.   Acceptance Of Impaired Classes (Section 1129(a)(8)) ................................... 20
    I.     The Plan Provides For The Statutorily Mandated Treatment Of
        Administrative And Priority Claims (Section 1129(a)(9)) ............................... 21
         1.   The Plan Provides For the Payment in Full of All Allowed
              Administrative Expense Claims and Priority Claims, Except To the
              Extent That Holders Of Such Claims Have Agreed To Different
              Treatment Of Such Claims. .................................................................. 22

|   | 2. | The Fundamental Policy of Rehabilitation of Debtors in Chapter 11 Proceedings Supports the Treatment of General Administrative Claims and Priority Claims Provided in the Plan, and, Therefore, Confirmation of the Plan is in the Best Interests of All Parties Involved. | 34 |
| J. | | At Least One Impaired Class of Claims Has Accepted the Plan, Excluding The Acceptances of Insiders (Section 1129(a)(10)) | 35 |
| K. | | The Plan Is Feasible (Section 1129(a)(11)) | 35 |
| L. | | The Plan Provides For The Payment Of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)) | 37 |
| M. | | The Plan Complies With Section 1129(a)(13) Of The Bankruptcy Code | 37 |
| N. | | The Plan is Fair and Equitable With Respect to Impaired Classes (Section 1129(b)) | 37 |

**CONCLUSION** .......................................................................................................... 42

## INTRODUCTION

This Court should confirm the Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated September 5, 2002 (as amended and modified, the "Plan").[2]  The Plan is the product of substantial discussions and negotiations among the Debtors and their primary creditor constituents.  The Debtors believe that the terms of the Plan are fair and appropriate with respect to all Holders of Claims and Equity Interests, taking into account the financial situation of the Debtors and the legal priority of such Claims and Equity Interests.  The Lenders, classified in Class 4 (the only Class entitled to vote on the Plan), who voted have voted unanimously to approve the Plan.  The Debtors submit the Plan complies with all applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  In particular, with respect to section 1129(a)(9) of the Bankruptcy Code, the Debtors contend that the "deemed consent" provisions of the Plan are supported by the plain meaning of the section, as well consistent with other provisions of the Bankruptcy Code and policy.  Moreover, the particular facts and circumstances of these cases, including that approximately 95% of the Debtors' administrative and priority creditors, who hold approximately 93.5% of the total amount of such claims, will either be paid in full, have affirmatively accepted the treatment afforded under the Plan or otherwise reached an agreement with the Debtors, as well as the Debtors' extensive efforts to provide opportunities for such creditors to elect to agree or not agree to the treatment under the Plan, support the "deemed consent" provisions of the Plan.  In support of confirmation, the Debtors respectfully submit this Memorandum in Support of Confirmation of the Plan (the "Memorandum").

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the Disclosure Statement, as applicable.

## HISTORICAL BACKGROUND AND CHAPTER 11 CASES

### A.    Historical Background of Debtors

Teligent, Inc. is the ultimate parent corporation to twenty domestic subsidiaries, all of whom are debtors and debtors in possession herein, as well as to many non-debtor foreign subsidiaries (the "Foreign Subsidiaries" and, collectively with the Debtors, "Teligent").  Prior to May 21, 2001 (the "Petition Date"), Teligent provided communication services in the form of local and long distance telephone, high-speed data, and Internet access services through its SmartWave™ local networks to 43 major domestic markets and internationally through various joint ventures.  The SmartWave™ local networks combined advanced wireless technologies with traditional wireline technologies and provided an efficient method for the delivery of broadband services to small and medium size business customers.  This delivery was effected by the use of "fixed wireless" technology, which provided for the wireless transmission of voice and data traffic directly to a customer's premises, thus obviating the need for the expensive and disruptive deployment of fiber optic cable.  As of the Petition Date, the Debtors had approximately 1,480 full-time and part-time employees.

At the time these cases were commenced, Teligent had approximately 35,000 customers located in every major metropolitan city in the United States.  The nature of Teligent's business required significant capital expenditures to finance the deployment of services, including purchasing and installing equipment, operating a network and hiring and retaining employees.  However, the rapid expansion of Teligent's business and the associated expenditures resulted in operating losses and negative cash flow in every year since Teligent's inception in 1997.  For the fiscal year ended December 31, 2000, Teligent, on a consolidated basis, reported revenues of approximately $152,072,000 and net losses of approximately $807,986,000.  As of

December 31, 2000, Teligent's consolidated books and records reflected assets totaling approximately $1,209,476,000 and liabilities totaling approximately $2,170,061,000.

As of the Petition Date, the Debtors were parties to a certain Credit Agreement, dated as of July 2, 1998 (as amended, supplemented or otherwise modified prior to the Petition Date, the "Credit Agreement"), among Teligent, Inc., the several banks and other financial institutions from time to time parties thereto (the "Lenders") and JPMorgan Chase Bank, in its capacity as administrative agent for the Lenders (in such capacity, the "Agent"). Before the Petition Date, the Lenders made loans to the Debtors, and otherwise advanced credit to or for the benefit of the Debtors pursuant to and in accordance with the terms and conditions of the Credit Agreement. All of the Debtors' obligations under the Credit Agreement are secured by perfected liens on substantially all of the Debtors' assets.

Teligent has not been immune to the travails that have affected and continue to affect the telecommunications industry. Indeed, Teligent had received waivers from the Lenders since December 31, 2000 relating to covenants in the Credit Agreement regarding the achievement of certain financing and performance targets and the maintenance of certain financial ratios. However, the last waiver from the Lenders expired on May 21, 2001. Based on the Debtors' financial condition, liquidity and prospects, the Debtors determined that a financial restructuring of their businesses through a chapter 11 process was necessary and appropriate. As of the Petition Date, the outstanding obligations to the Lenders under the Credit Agreement were approximately $800,000,000.

In addition to its secured obligations under the Credit Agreement, in November 1997, Teligent, Inc. issued $300 million of 11 1/2% senior notes due 2007 pursuant to that certain indenture dated November 26, 1997, between Teligent, Inc., as issuer, and First Union

National Bank, as trustee (the "Indenture Trustee"). Under a 1998 exchange offer, Teligent, Inc.

issued $440 million of 11 1/2% Series B Discount Notes due 2008 (the "Discount Notes"), in

exchange for certain previously issued securities. The Discount Notes are governed by that

certain Indenture dated February 20, 1998, between Teligent, Inc., as issuer, and the Indenture

Trustee.

### B.  The Chapter 11 Cases

#### 1.  Commencement of Cases

On the Petition Date, the Debtors commenced their cases under chapter 11 of the

Bankruptcy Code in the Bankruptcy Court. The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered, but have

not been substantively consolidated.

#### 2.  Cash Collateral Order

On June 13, 2001, the Bankruptcy Court entered the Cash Collateral Order.

Pursuant to the Cash Collateral Order, the Lenders agreed to allow the Debtors to use the

Lenders' Cash Collateral subject to the terms and conditions of the Cash Collateral Order and the

applicable Budget (as defined in the Cash Collateral Order) then in effect in the ordinary course

of the Debtors' business operations. In addition, the Debtors provided certain adequate

protection in favor of the Lenders' interest in the Debtors' property. The validity of the Lenders'

liens on all of the Debtors' property as well as the Lenders' claims were confirmed. In addition,

the time period reserved under the Cash Collateral Order for other parties in interest to

investigate and challenge such liens and claims expired in November 2001, without any such

challenge being filed. Accordingly, pursuant to the Cash Collateral Order, all of the Lenders'

claims are allowed, as all senior liens are valid, for all purposes of these Chapter 11 Cases. The

Debtors have continued to use funds pursuant to the Cash Collateral Order pursuant to approved budgets. As set forth in the Cash Collateral Order, all amounts advanced to the Debtors thereunder are deemed loans (the "Postpetition Loans"). As of July 2002, there were approximately $72 million in Postpetition Loans outstanding in favor of the Lenders.

### C.     Sale Efforts

Immediately after the Petition Date, the Debtors, with the assistance of their legal and financial advisors, began to evaluate various reorganization strategies. These efforts focused primarily on two different alternatives – reorganizing their businesses around their core retail operations and divesting their operations as a going concern to one or more purchasers. After evaluating their restructuring alternatives, the Debtors determined that selling their businesses would provide the best opportunity to maximize the value of their estates. The Debtors began concerted efforts to identify potential suitors for their businesses and to solicit offers from such parties.

### 1.     Sale of Core Retail Business

The Debtors' initial efforts to divest assets focused on a sale of their core retail business. With the assistance of their financial advisor, the Debtors identified and solicited over 50 financial and strategic potential purchasers for the business. Ultimately, after many weeks of negotiations, on August 23, 2001, certain of the Debtors entered into an Asset Purchase Agreement (the "Agreement") with Teligent Acquisition Corp. ("TAC") for the sale and purchase of substantially all of the Debtors' core domestic retail business and assets. Under the Agreement, TAC, a third party financial suitor, agreed to pay, subject to certain financing and regulatory contingencies, in excess of $115 million for the Debtors' core domestic fixed wireless business and assets. TAC intended to continue operating the Debtors' core businesses as a going concern after the acquisition. This would have resulted in the continued services to

approximately 5,000 customers in 11 markets, as well as continued employment for over approximately 500 people.

On August 24, 2001, the Debtors filed a motion with the Bankruptcy Court requesting authority to sell the Debtors' core assets to TAC, subject to higher and better offers. The hearing to consider and approve the transaction with TAC, or an alternative higher and better offer, was initially scheduled for October 3, 2001. Despite modifications to lower the consideration payable by TAC under the Agreement and despite several adjournments of the sale hearing, in part due to changes in the capital markets in the wake of the September 11, 2001 terrorist attacks, TAC was unable to raise sufficient funds to consummate the transaction and the Debtors were unable to locate an alternative purchaser. On November 15, 2001, the Debtors provided notice to TAC terminating the Agreement due to TAC's inability to raise the funding required under the Agreement. During the period between the execution and termination of the Agreement, the Debtors continued to operate their retail businesses in the ordinary course, as was required under the Agreement.

As it became a more serious possibility that the transaction with TAC may not be consummated, the Debtors concurrently began developing an alternative strategy to minimize the continued incurrence of obligations in the event the transaction did not close. Immediately upon the termination of the Agreement, the Debtors sought approval from the Bankruptcy Court to reconfigure their retail operations. These actions to restructure the Debtors' retail operations were taken due to their inability to attract a suitable investor and/or purchaser in the time frame available. On November 14, 2001, the Bankruptcy Court authorized the Debtors to substantially reduce their workforce, file regulatory applications and notices regarding the discontinuance of certain services to a substantial number of customers in their then eleven remaining retail local

markets, and to issue notices to such affected customers. Due to the magnitude of the undertakings, both logistical and regulatory, the Debtors did not substantially complete the reconfiguration of their retail operations until the end of 2001. Indeed, given various regulatory requirements with respect to providing advance notice to customers prior to termination of telephone services, the Debtors could not immediately terminate these services.

### 2.    Sale of Enterprise Companies

In addition to the sale efforts with respect to their core retail operations, the Debtors began evaluating sale alternatives for their enterprise companies (stand-alone subsidiary businesses unrelated to the core Teligent operations). As of the Petition Date, the Debtors had 5 separate enterprise companies: InfiNet Telecommunications, Inc.; American Long Lines, Inc.; Telecommunications Concepts, Inc.; Easton Telecom Services, Inc. and Executive Conference, Inc. As of July 2002, all or substantially all of the assets of each of the enterprise companies have been sold or otherwise disposed. The aggregate sale price for the five enterprise companies was approximately $65 million, all or substantially all of which was paid to the Lenders.

### 3.    Fixed Wireless Business

Currently, the Debtors continue providing services based on their fixed-wireless spectrum and facilities, including private line, transport, and wholesale services in all 74 of the Debtors' markets (the "Remaining Business"). In addition, the Debtors continue to provide resold services in those markets and other locations nationwide. The Debtors have discontinued all local switched telecommunications services at this time.

### D.    Schedules and Administrative Claims Bar Date

On July 22, 2001, the Debtors filed their Statement of Financial Affairs and Schedules of Assets and Liabilities (collectively, as amended, the "Schedules"). At the request of the Debtors, the Court entered an order fixing February 20, 2002 as the last date and time at

which proofs of claim must be filed against the Debtors' estates (the "Administrative Claims Bar Date") with respect to certain administrative claims accrued from the Petition Date through February 20, 2002.   On or about January 17, 2002, the Debtors' notice and claims agent, Bankruptcy Management Corporation ("BMC") mailed a notice of entry of the order establishing the Administrative Claims Bar Date to all creditors listed on the Debtors' creditor matrix filed with the Bankruptcy Court.   The Debtors estimate that approximately 600 claims asserting aggregate amounts being owed in excess of $60 million were filed prior to the Administrative Claims Bar Date.   The vast majority of these claims were incurred during the period when the Debtors expected to sell their retail operations as a going concern.   The Debtors have concluded a preliminary review of these Claims, which if allowed, would be treated as General Administrative Claims under the Plan, and have identified 3 general categories of Claims:  (i) Claims relating to telecommunications services provided to the Debtors; (ii) Claims relating to leases for property leased to the Debtors; and (iii) all other Claims, which includes Claims for goods sold or services performed pursuant to agreements or in the ordinary course of business, taxes, utility services and other miscellaneous Claims.   While the Debtors estimate that over 600 administrative proofs of claim were filed, Holders of the 50 largest filed Claims hold approximately $56.7 million of the total amount filed.   Within this group, the Debtors estimate that 20 Claims were filed by Holders of telecommunications-related Claims in the aggregate amount of $43.7 million; 14 Claims were filed by Holders of lease-related Claims in the aggregate amount of $5.8 million; and 16 Claims were filed by Holders of other Claims in the aggregate amount of $7.2 million.

### E.    Plan and Disclosure Statement Process

The Debtors filed the Plan after evaluating their remaining alternatives for emerging from chapter 11.   The Plan is the product of substantial discussions and extensive

negotiations among the Debtors and their primary creditor constituents.  Pursuant to the Plan, the Debtors will emerge from chapter 11 as Reorganized Teligent and will continue to operate the Remaining Business.  Reorganized Teligent will be owned by the Lenders, who will exchange their post-petition loans and secured claims for a 100% equity interest in Reorganized Teligent.

Despite having senior claims and liens on all of the Debtors' assets, the Debtors have been able to negotiate with the Lenders to provide recoveries under the Plan to all Creditors.  The Plan provides for the creation of a Claim Fund of $4,000,000 (subject to certain adjustments) to pay outstanding administrative and priority creditors.  Furthermore, the Plan provides for a convenience class for Administrative Convenience Claims and Priority Convenience Claims in an amount equal to or less than $3,000.  Holders of Convenience Claims will be paid their allowed claims in full in cash from the Claim Fund on or as soon as practicable after the Effective Date.  Moreover, the Plan provides that the Holders of General Unsecured Claims will receive the proceeds of the Chapter 5 Causes of Action.  Under the Plan, the Debtors will transfer $300,000 to the Unsecured Claims Estate Representative to investigate and pursue the Chapter 5 Causes of Action.  Despite having a senior secured lien among all of the Debtors' assets, the Lenders have agreed, in consideration for the support of the Official Committee of Unsecured Creditors, to make distributions available to junior creditors as set forth in the Plan.

On July 10, 2002, the Court approved the Disclosure Statement and authorized and empowered the Debtors to solicit acceptances of Holders of Prepetition Lender Secured Claims in Class 4.  Because the Debtors are not expecting all administrative and priority creditors to be paid in full under the Plan, the Debtors also began soliciting consents to the treatment afforded under the Plan from known administrative and priority creditors not expected to be paid in full under the Plan pursuant to a Consent Form approved by the Court.

## VOTING STATUS

The deadline for submitting ballots to accept or reject the Plan was August 7, 2002, at 5:00 p.m., prevailing eastern time.  The Debtors are submitting contemporaneously with this Memorandum the Affidavit of Bankruptcy Management Corporation (the "Voting Affidavit").  The Voting Affidavit indicates that Holders of Claims in Class 4, the only class entitled to vote on the Plan, voted unanimously to accept the Plan.  The Debtors are also submitting contemporaneously with this Memorandum the Affidavit of William R. Tyson in Support of the Confirmation of the Debtors' Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Tyson Affidavit").  The Tyson Affidavit describes the solicitation process and protocols as well as the results with respect to the consents from administrative and priority creditors.

## ARGUMENT

The Debtors submit that the Plan complies with all relevant sections of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable non-bankruptcy law relating to confirmation of the Plan.  In particular, the Plan fully complies with all of the requirements of sections 1122, 1123 and 1129 of the Bankruptcy Code. This Memorandum addresses each requirement individually.

## I.    THE DEBTORS' PLAN SHOULD BE CONFIRMED

### A.    The Plan Complies With The Applicable Provisions Of The Bankruptcy Code (Section 1129(a)(1))

Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of chapter 11 of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) and case law indicate that a principal objective of this provision is to assure compliance with the sections of the Bankruptcy Code

governing classification of claims and interests and the contents of a plan of reorganization.  See

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong., lst Sess. 412

(1977); In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988); In re Johns-Manville Corp., 68

B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407

(S.D.N.Y. 1987), aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In

re Toy & Sports Warehouses, Inc., 37 B.R. 141 (Bankr. S.D.N.Y. 1984); In re S&W Enterprise,

37 B.R. 153, 158 (Bankr. N.D. Ill. 1984).   As explained below, the Plan complies with all

applicable provision of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy

Code, including, without limitation, sections 1122 and 1123.

> **1.      The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122
> By Placing Only Substantially Similar Claims or Equity Interests in
> Each Class**

Section 1122 of the Bankruptcy Code provides that, "absent agreement to the

contrary, a plan may place a claim or interest in a particular class only if such claim or interest is

substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  This

requirement of substantial similarity does not mean, however, that claims or interests within a

particular class must be identical.  In re DRW Property Co., 60 B.R. 505, 511 (Bankr. N.D. Tex.

1986).  Instead, a plan proponent has flexibility in classifying claims, so long as the proponent

has some reasonable basis for the classification, or the creditor agrees to the classification of its

claim.  See In re Jersey City Medical Center, 817 F.2d 1055, 1060-61 (3d Cir. 1987) ("Congress

intended to afford bankruptcy judges broad discretion under [11 U.S.C. § 1122] to decide the

propriety of plans in light of the facts of each case"); In re U.S. Truck Co., Inc., 800 F.2d 581,

586 (6th Cir. 1986) (noting courts were given "broad discretion" to determine proper

classification); see also Matter of Briscoe Enterprises, Ltd., II, 994 F.2d 1160, 1167 (5th Cir.

1993); In re Atlanta West VI, 91 B.R. 620, 626 (Bankr. N.D. Ga. 1988) (flexibility in claims

classifications promotes the rehabilitative purposes of chapter 11 reorganization and enables plan proponents to deal with the complex commercial realities that debtors often confront).

The Bankruptcy Code also does not absolutely require the same classification for claims that may share some similar attributes. See, e.g., Jersey City, 817 F.2d at 1060 ("[t]he express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes"); U.S. Truck, 800 F.2d at 585; In re Ionosphere Clubs, Inc., 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("a debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class").

As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests under the Plan contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class. Accordingly, the classification of Claims and Equity Interests under the Plan satisfies the requirements of sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### 2.    The Plan Satisfies the Requirements of 11 U.S.C. § 1123(a)

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply. See 11 U.S.C. § 1123(a). The Plan fully complies with each requirement. Article III of the Plan designates classes of Claims and Equity Interests as required by section 1123(a)(1) of the Bankruptcy Code.[3] Pursuant to sections 1123(a)(2) and (3) of the Bankruptcy Code, Article III of the Plan specifies the Classes that are not impaired under the Plan and specifies the treatment of each Class of Claims and Equity Interests that is impaired.

---

[3] Under the Bankruptcy Code, administrative claims and certain priority tax claims need not be classified. See 11 U.S.C. § 1123(a)(1).

Unless otherwise agreed to by particular Holders, all of the Holders of Claims or Equity Interests within each of the Classes are treated identically under the Plan as required by section 1123(a)(4) of the Bankruptcy Code.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article VI and various other provisions of the Plan specifically provide adequate means for the Plan's implementation, including, without limitation: (a) the substantive consolidation of the estates of the Debtors; (b) the continuation of the corporate existence and the vesting of assets in Reorganized Teligent; (c) the cancellation and termination of all notes, instruments, debentures, certificates and other documents evidencing Claims and Equity Interests in any of the Debtors; (d) the issuance of New Teligent Common Stock; (e) the adoption of the New Teligent Charter, New Teligent Bylaws, and Stockholders Agreement; and (f) the authorization of the Debtors or Reorganized Teligent to take or cause to be taken any corporate action necessary or appropriate before or after the Effective Date for the effectuation of the Plan.

In accordance with section 1123(a)(6) of the Bankruptcy Code, Article VI.I(1) of the Plan provides for the inclusion in the New Teligent Charter and New Teligent Bylaws of all provisions required to be included in the corporate charter of Reorganized Teligent under section 1123(a)(6) of the Bankruptcy Code.

Finally, the terms and conditions of the Plan contain provisions consistent with the interests of the Debtors' creditors and with public policy as to the manner and selection of any officer, director or trustee and any successor thereto, thereby satisfying the requirements of section 1123(a)(7) of the Bankruptcy Code.

**B.    The Debtors Have Complied Fully With The Applicable Provisions Of The Bankruptcy Code (Section 1129(a)(2))**

Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.   11 U.S.C. § 1129(a)(2).  The legislative history and cases interpreting section 1129(a)(2) of the Bankruptcy Code indicate that the purpose of section 1129(a)(2) is to ensure that the plan proponent complies with the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.  See In re Cajun Electric Power Co–op., Inc., 150 F.3d 503, 513 n.3 (5th Cir. 1998), cert. denied, 454 U.S. 825, 119 S.Ct. 2019 (1999); In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988); In re Prudential Energy Co., 58 B.R. 857 (Bankr. S.D.N.Y. 1986); In re Butler, 42 B.R. 777, 782 (Bankr. E.D. Ark. 1984); In re Toy & Sports Warehouse, Inc., 37 B.R. at 149; S. Rep. No. 989, 95th Congr., 2d Sess. 126; H.R. Rep. No. 595, 95th Cong., 1st Sess. 412.

The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 and Bankruptcy Rules 3017, 3018 and 3019.  The solicitation of acceptances of and consents to the Plan was (a) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation, and (b) solicited after disclosure to the Holders of Claims or Equity Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code.

**C.    The Debtors Have Proposed The Plan In Good Faith (Section 1129(a)(3))**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy

Code." In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000). As one court stated, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." In re Zenith Elecs. Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the proposal of a chapter 11 plan. See In re Jasik, 727 F.2d 1379 (5th Cir. 1984).

The Debtors proposed the Plan in good faith and not by any means forbidden by law. Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Debtors assert that the Plan enables Holders of Claims to realize the highest possible recoveries under the circumstances. The Plan is the result of extensive and transparent arms-length negotiations among the Debtors, the Lenders and other major constituents. The Plan is supported by the Official Committee of Unsecured Creditors and the Agent for the Lenders as the best available alternative to Creditors under the circumstances, thus evidencing their acknowledgment that the Plan is fundamentally fair. Indeed, the Debtors are not aware of any other viable alternative to emerge from chapter 11. Every other alternative considered would result in lower recoveries for all Holders of Administrative, Priority and General Unsecured Claims. Under the circumstances of these cases, the Plan is consistent with the objectives and purposes of the Bankruptcy Code.

Moreover, the Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith. The Plan formulation process itself, which involved lengthy and extensive negotiations with major constituents, demonstrates the Debtors' good faith in dealing with its creditors. In re Stolrow's, Inc., 84 B.R. 167, 172 (9th Cir. BAP 1988) (good faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors"). Moreover, as provided in section V(A) of the Disclosure Statement, if the Plan is not

confirmed, all creditors would have to wait a longer period of time to receive an uncertain, if any, distribution than they would under the Plan.  The Plan preserves and attempts to maximize the value of the Debtors' assets and proposes distributions to creditors as promptly as possible under the circumstances of these Chapter 11 Cases.  Generally, such a plan meets the good faith standard under section 1129(a)(3) of the Bankruptcy Code.  Toy & Sports Warehouse, 37 B.R. at 149.

> **D.      The Plan Provides For Bankruptcy Court Approval Of Certain Administrative Payments (Section 1129(a)(4))**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan, be subject to approval of the Court as reasonable.  section 1129(a)(4) of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the Court as to their reasonableness.  See, e.g., In re River Village Assocs., 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993), aff'd, 181 B.R. 795 (E.D. Pa. 1995).

Pursuant to the interim application procedures established under section 331 of the Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses of professionals retained in the Chapter 11 Cases.  See Order Under §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Committee Members, entered June 14, 2001.  All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Confirmation Date, remain subject to final review for reasonableness by the Court under section 330 of the Bankruptcy Code.  In addition, pursuant to sections 503(b)(3) and (b)(4) of the Bankruptcy Code, the Court must review any applications for substantial contribution, if any, to ensure

compliance with the statutory requirements and that the fees requested are reasonable. Finally, all other payments required to be disclosed under section 1129(a)(4) of the Bankruptcy Code have in fact been disclosed.

The foregoing procedures for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors satisfy the objectives of section 1129(a)(4) of the Bankruptcy Code. See In re Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative expenses); In re Future Energy Corp., 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by various Code provisions – e.g., §§ 328, 329, 330, 331, and 503(b) – and need not be explicitly provided for in a Chapter 11 plan").

**E.    The Identity Of Certain Individuals Who Will Hold Positions Post-Confirmation Has Been Disclosed (Section 1129(a)(5))**

Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires the proponent of a plan to disclose the identity of certain individuals who will hold positions with the debtor or its successor after confirmation of the plan. Section 1129(a)(5)(A)(ii) requires that the service of such individuals be "consistent with the interests of creditors and equity security holders and with public policy." In re Apex Oil Co., 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990) (section 1129(a)(5)(A) satisfied where debtors and creditors' committee believe control of entity by proposed individuals will be beneficial); In re Texaco Inc., 84 B.R. at 908 (section 1129(a)(5) satisfied when the plan discloses the debtors' existing officers and directors who will continue to serve in office after plan confirmation); Toy & Sports Warehouse, 37 B.R. at 149-151 (continuation of debtor's founder and president, who had many years of experience in debtor's business, satisfied section 1129(a)(5) of the Bankruptcy Code).

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial Board of Directors for Reorganized Teligent shall consist of the following individuals:  James V. Continenza and Stuart Kupinsky.  The election or appointment of the proposed Board of Directors is consistent with the interests of the Holders of Claims and Equity Interests and public policy.  In addition, the following insider officers will be retained by Reorganized Teligent:  James V. Continenza as the Chief Executive Officer and William Marshall as the Chief Financial Officer.

**F.  The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6))**

Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  The foregoing provision is inapplicable in these Chapter 11 Cases because the Plan does not provide for, or contemplate, any rate changes with respect to the current businesses.

**G.  The Plan is in the Best Interests of Creditors and Equity Interest Holders (Section 1129(a)(7))**

Section 1129(a)(7) of the Bankruptcy Code provides that a plan will not be confirmed, regardless of whether or not anyone objects to confirmation, unless the bankruptcy court finds that the plan is in the "best interests" of all classes of claims and interests which are impaired.  The "best interest" test will be satisfied by a finding of the Court that either (i) all Holders of impaired Claims or Equity Interests have accepted the Plan, or (ii) the Plan will provide such a Holder that has not accepted the Plan with a recovery at least equal in value to the recovery such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. §§ 1129(a)(7)(A)(i) and (ii).  The best interests test applies to individual dissenting creditors rather than classes of claims.  See Bank of Am. Nat'l Trust & Sav.

Ass'n v. 203 LaSalle St. Partnership, 526 U.S. 434 (1999);   In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992).   As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to non-accepting impaired claims or interests.   If a class of claims or interests unanimously accepts the plan, the best interests test is deemed satisfied for all members of that class.   11 U.S.C. § 1129(a)(7).[4]

In these Chapter 11 Cases, it thus becomes necessary to examine whether the Plan satisfies the best interest test regarding Holders of Claims in Class 1 (Other Priority Claims), Class 3 (Other Secured Claims), Class 4 (Prepetition Lender Secured Claims), Class 5 (General Unsecured Claims) and Class 6 (Old Equity Interests).   This requires a determination of what such creditors would receive in a chapter 7 liquidation in comparison to what they will receive under the Plan.   However, determining what an impaired, non-consenting class member would receive in a hypothetical chapter 7 liquidation necessarily requires the making of reasonable assumptions and judgments.   In re Crowthers McCall Pattern, Inc., 120 B.R. 279 (Bankr. S.D.N.Y. 1990); In re Neff, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985), aff'd, 785 F.2d 1033 (5th Cir. 1986).   The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' remaining assets in the context of a chapter 7 liquidation.   Such value must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a trustee's fees, and the fees and expenses of professionals retained by a trustee.   The potential

---

[4]   Pursuant to section 1126(f) of the Bankruptcy Code, a class that is unimpaired under a plan is conclusively deemed to have accepted the plan.   Each Holder of a Priority Convenience Claim in Class 2 is unimpaired and is conclusively deemed to have accepted the Plan.   As a result, the best interests test is satisfied with respect to Holders of Claims in Class 2.

chapter 7 liquidation distribution in respect of each Class must be further reduced by costs imposed by the delay caused by conversion to chapter 7. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired Class is then compared to the recovery in respect of such Class provided for in the Plan.

For the reasons set forth herein, the Debtors submit that each holder of a Claim or Equity Interest in an impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. A chapter 7 liquidation of the Debtors' estates would result in a significant reduction in the ultimate proceeds available for distribution to all Creditors and Equity Interest Holders in the Chapter 11 Cases. The increased administrative and other costs and expenses associated with liquidation under chapter 7 would further reduce the assets available for distribution. In addition, based on negotiations with the Lenders, distributions are only being made available to Holders of General Administrative Claims, Priority Claims and General Unsecured Claims pursuant to the Plan that would not be available if the cases were converted to chapter 7. Furthermore, inasmuch as Holders of Claims or Equity Interests in Classes 5 and 6 will receive no distributions under the Plan, they will receive "not less than the amount" they would receive in a chapter 7 case. Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

## H.    Acceptance Of Impaired Classes (Section 1129(a)(8))

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims in that class actually vote to accept the plan. 11 U.S.C. § 1126(c). A class that is not impaired under a plan, and each holder

of a claim or interest of such class, is conclusively presumed to have accepted the plan.  11 U.S.C. § 1126(f); see also S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the plan or in the order confirming the plan"); In re Ruti-Sweetwater, 836 F.2d 1263, 1267 (10th Cir. 1988) ("For purposes of acceptance of a plan, section 1126(f) provides that a class that is not impaired under the plan is 'conclusively presumed' to have accepted the plan").  On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.  11 U.S.C. § 1126(g).

Pursuant to sections 1126 and 1129(a)(8) of the Bankruptcy Code, as indicated in the Voting Affidavit, Holders of Claims in Class 4, the only impaired class entitled to vote on the Plan, have accepted the Plan pursuant to section 1126(c) of the Bankruptcy Code.  Because the Plan provides that Holders of Claims in Class 5 and Holders of Equity Interests in Class 6 will not receive any distribution or retain any property under the Plan, Classes 5 and 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  In addition, Classes 1 and 3 are also deemed to have rejected the Plan.  Notwithstanding the lack of compliance of section 1129(a)(8) of the Bankruptcy Code with respect to Classes 1, 3, 5 and 6, the Plan is confirmable because, as more fully set forth in Section I.N of this Memorandum, the Plan satisfies section 1129(b)(1) of the Bankruptcy Code with respect to Classes 1, 3, 5 and 6.

I.    **The Plan Provides For The Statutorily Mandated Treatment Of Administrative And Priority Claims (Section 1129(a)(9))**

As explained below, Article II of the Plan provides for payment and satisfaction of the General Administrative Claims and Priority Claims in the manner that is consistent with section 1129(a)(9) of the Bankruptcy Code.

1.   **The Plan Provides For the Payment in Full of All Allowed Administrative Expense Claims and Priority Claims, Except To the Extent That Holders Of Such Claims Have Agreed To Different Treatment Of Such Claims.**

Section 1129(a)(9) of the Bankruptcy Code requires that, "except to the extent that the holder of a particular claim has agreed to a different treatment," a plan must provide for all holders of allowed administrative expense claims to be paid in cash on the effective date, and for all holders of allowed priority claims to be paid in full in cash (depending on the specific type of claim, either on the effective date of a plan or over time with interest.)   11 U.S.C. § 1129(a)(9). Here, the Plan provides for the creation of a Claim Fund of $4,000,000 (subject to certain adjustments) from which Holders of General Administrative Claims and Priority Claims will be paid.   As set forth in the Plan, Reorganized Teligent intends to make a pro rata distribution based on the funds available in the Claim Fund, followed by periodic cash payments until such Allowed General Administrative Claims and Allowed Priority Claims are paid in full or until the Claim Fund is exhausted.   Plan Article II, Section A and Section C.   The Plan further provides for payments in full in cash to the Holders of Allowed Administrative Convenience Claims and Holders of Priority Convenience Claims on, or as soon as practicable after, the Effective Date.   Such payments would also be made from the Claim Fund.   Plan Article II, Section A and Section C.

Because the Debtors do not anticipate that all such Holders will be paid in full, the Debtors have sent a Consent Form to each known Holder of a General Administrative Claim and Priority Claim not entitled to be paid in full seeking the consent of such Holder to the "different treatment" as set forth in the Plan.   Despite having received affirmative responses from a substantial majority of such creditors, some did not respond to the repeated requests by the Debtors to return the Consent Forms.   The Debtors submit that under the particular facts and

circumstances in these cases, including the use of a specifically designed Consent Form and a targeted communication campaign, such Holders should be "deemed" to agree to the "different treatment" set forth under the Plan, in satisfaction of section 1129 of the Bankruptcy Code.[5]

(a)    **The Plan's Deemed Consent Provisions Are Reasonable and Appropriate.**

The plain reading of section 1129(a)(9) of the Bankruptcy Code requires administrative and priority creditors to be paid in full unless they agree to a different treatment of their claim. 11 U.S.C. § 1129(a)(9). To facilitate the process through which administrative and priority creditors could consent to or reject the different treatment proposed under the Plan, the Debtors provided each known administrative and priority creditor (other than Holders of Convenience Claims, who are to be paid in full under the Plan) with the Administrative Claim Consent Form or Priority Claim Consent Form approved by the Court (the "Consent Forms"), as applicable. The Debtors made considerable efforts, described below, to contact and request that administrative and priority creditors consent to or reject the "different treatment" of their Claims under the Plan by completing and returning the Consent Forms to the Debtors. The Plan's "deemed consent" provision only applies to the substantial minority who failed to return the Consent Form.

The plain language and the legislative history of section 1129(a)(9) of the Bankruptcy Code only require that holders of administrative or priority claims "agree" to different treatment. 11 U.S.C. § 1129(a)(9). There is nothing in section 1129(a)(9) of the Bankruptcy Code or the legislative history that requires a party to "affirmatively agree" or enter

---

[5]  The Debtors received numerous objections from administrative and priority creditors to the treatment of such parties' claims under the Plan. In addition, the Debtors did receive numerous Consent Forms from creditors who
(Continued…)

into an actual or "affirmative agreement," whether written or oral.  Courts should "properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'"  Pioneer Investment Service Co. v. Brunswick Associates Limited Partnership, et al., 507 U.S. 380, 387, 113 S.Ct. 1489, 1494 (1993) (quoting Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314 (1979)).  The ordinary and common meaning of "agree" according to Webster's is "to grant consent; assent; to concede or grant,"  WEBSTER'S II NEW COLLEGE DICTIONARY 23 (1999); see also AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 36 (1996) ("to grant consent; accede"), which indicates that there are numerous ways a party can "agree," including by conceding or acceding.  There is nothing within the ordinary and common meaning of "agree" to indicate that an affirmative act is required, or that one cannot "agree" through acquiescence or inaction.[6]  Congress' plain use of the word "agree" in section 1129(a)(9) of the Bankruptcy Code thus permits the entire range of conduct included in the definition of the word "agree," and not a limited scope that would require an affirmative act.

Indeed, Congress has exhibited the ability and capacity to require an affirmative act when it deems it necessary by using language other than "agree."  For example, section 1129(a)(8) of the Bankruptcy Code requires that each class under a plan "accepts" the plan or is unimpaired.  11 U.S.C. § 1129(a)(8).  In order to accomplish this, Bankruptcy Rule 3018(c) provides the method through which a creditor must cast a vote on a plan of reorganization,

---

elected not to agree to the treatment under the Plan.  As of the confirmation hearing, the Debtors believe there will be no pending objections or Consent Forms from creditors who elected not to agree to the treatment under the Plan.

[6]  See, e.g., American Heritage at 111 ("assent…1. Agreement;…2. Acquiescence); Id. at 16 ("acquiescence… 1. Passive assent or agreement without protest"); BLACK'S LAW DICTIONARY 66 (6th ed. 1990) ("Concur or acquiesce in").  While it is certainly possible that one could "agree" by taking an affirmative act, the ordinary use of the word does not require such.

stating that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted

or rejected, be signed by the creditor....and conform to the appropriate Official Form."

Bankruptcy Rule 3018.  By using the word "accept" and defining it precisely as requiring written

evidence of such acceptance, it is evident that an affirmative act is required with respect to

voting for a plan.  Notably, there is no parallel Bankruptcy Rule for establishing how a party can

"agree" to a different treatment under section 1129(a)(9) of the Bankruptcy Code.  In contrast,

use of the word "agree" without reliance on a nonordinary meaning in section 1129(a)(9)

demonstrates a different, broader intent.  Because the language of section 1129(a)(9) does not

restrict in any way the method of agreeing required, the full range of meanings must be attributed

to its use in that section, including that a creditor's inaction under the appropriate circumstances,

could be considered a "deemed consent."[7]

       While there is very little direct case law interpreting what is necessary to satisfy

the "agree" standard, a similar "deemed consent" provision in a plan has recently been upheld in

the context of section 1129(a)(9) of the Bankruptcy Code.  See In re Trans World Airlines, Inc.

et al., Case No. 01-0056, transcript of confirmation hearing, at 10-15 (Bankr. D. Del. June 14,

---

[7]  A review of the legislative history relating to section 1129(a)(9) of the Bankruptcy Code does not reveal any
indication that Congress intended a more restrictive interpretation of the word "agree" than is generally accepted.
The relevant legislative history of section 1129(a)(9) of the Bankruptcy Code provides that:

> Paragraph (8) is central to the confirmation standards.  It requires that each class either
> have accepted the plan or be unimpaired.

> Paragraph (9) augments the requirements of paragraph (8) by requiring payment of each
> priority claim in full.  It permits payments over time and payment other than in cash, but
> payment in securities is not intended to be permitted without consent of the priority
> claimant even if the class has consented.  It also permits a particular claimant to accept
> less than full payment.

House Report No. 95-595, 95th Cong., 1st Sess. 413 (1977).  Indeed, the legislative history does not support a
reading of section 1129(a)(9) that would require an affirmative act in order for a creditor to agree to a "different
treatment."

2002 ).[8]  In <u>TWA</u>, the debtors' plan of reorganization in essence provided for similar treatment

for administrative and priority creditors as under the Plan here.  Specifically, the <u>TWA</u> plan

provided that an administrative or priority creditor's failure to object to the treatment of its claim

under the proposed plan of reorganization would be deemed its consent.  Judge Walsh confirmed

the plan over the objection of the Office of the United States Trustee, stating that:

> Section 1129(a)(9) specifically allows for the alternative treatment of
> administrative/priority claims.  *The only issue is whether the plan adequately*
> *provides for the exercise of electing the alternative treatment of receiving less*
> *than the full amount of the claim.*  I find that it does.

<u>In re TWA</u>, Case No.  01-0056, transcript of confirmation hearing, at 12 [emphasis added].

Perhaps more importantly, Judge Walsh also recognized that

> the method for agreeing to the [treatment] is not dictated by the language of the
> [section 1129(a)(9)]….[T]he section does not require a claimant to enter into "an
> agreement," whether written or oral.  It merely requires that the claimant agree to
> the alternative treatment….In this case, the claimants agreed by the simple act of
> not saying no; i.e., not registering an objection in writing to the debtor.

<u>Id</u>. at 13. Accordingly, the court held that a deemed consent provision similar to that in the

Debtors' Plan was proper and enforceable.[9]

The Debtors submit that a "deemed consent" provision is appropriate under

section 1129(a)(9) of the Bankruptcy Code if a debtor can show that creditors had sufficient

---

[8]   A copy of the transcript from the confirmation hearing where the Court issued its ruling regarding section 1129(a)(9) is included as Confirmation Exhibit 10.

[9]   The Debtors respectfully submit that the court in <u>In re Digital Impact, Inc.</u>, 223 B.R. 1 (Bankr. N.D. Ok. 1998) was considering a distinguishable set of facts and, even under those facts, incorrectly interpreted section 1129(a)(9) to require that an affirmative agreement was required for a creditor to have agreed to a "different treatment" under a plan.  In <u>Digital Impact</u>, it is not evident that the debtor engaged in a targeted solicitation where each and every administrative creditor was contacted and given several opportunities and methods by which to grant or withhold consent to "different treatment" offered.  Rather, the debtor attempted to apply the voting  parameters under section 1126 of the Bankruptcy Code to bind creditors who did not respond to a solicitation.  Nevertheless, as set forth above, section  1129(a)(9) does not require an "affirmative" agreement, but rather only that a party "agree" to a different treatment.  As Judge Walsh stated, "The <u>Digital Impact</u> decision interprets section 1129(a)(9) as requiring an 'affirmative agreement.'  That is not wording of Section 1129(a)(9)."  Confirmation Exhibit 10 at p. 12.

opportunity to exercise an election for or against the alternative treatment of receiving less than

the full amount of the claim.  Similar to the debtors' plan and disclosure statement in <u>TWA</u>, a

copy of each of which is submitted as Confirmation Exhibits 11 and 12 respectively, the

Debtors' Plan, Disclosure Statement and Consent Forms are replete with specific references that

the Debtors intend to seek a ruling that the failure to take action would be "deemed consent" of

the Plan.  For example, to provide adequate notice to administrative creditors of the "different

treatment" of their claims under the Plan, the Debtors included numerous provisions in the

Disclosure Statement, Plan, and Consent Forms highlighting their position and intent with

respect to General Administrative Claims and Priority Claims.  <u>See</u> Disclosure Statement,

Section B.1, B.3; Plan Article II, Section A; Consent Forms.

Importantly, however, the Debtors' plan incorporates substantial additional

procedures and protocols that were not implemented under <u>TWA's</u> plan.  To "adequately provide

for the exercise of electing the alternative treatment," the Debtors in fact took several steps to

simplify the process through which administrative and priority creditors could consent or object

to the treatment of their claim under the Plan.[10]   As an initial step, the Debtors distributed a

brief, two-page consent form ("Consent Form") to all known Holders of General Administrative

Claims and Priority Claims who are not expected to be paid in full.[11]   The Consent Forms

described the treatment provided for such claims under the Plan and requested that the creditor

either  (a) agree  to  the  treatment  provided  under  the  Plan;  (b) elect  to  be  treated  as  an

---

[10]  See Affidavit of William R. Tyson In Support of Confirmation of Third Amended Joint Plan of Reorganization
Under Chapter 11 Of The Bankruptcy Code, submitted as Confirmation Exhibit 5, for a detailed discussion of the
Debtors' solicitation efforts with respect to the administrative and priority creditors and the treatment of their claims
under the Plan.

[11]  The Debtors estimate that approximately 1,480 creditors qualified as Holders of Convenience Claims under the
Plan.  Since all of these parties would be paid in full, the Debtors did not send them a Consent Form.

Administrative Convenience Claim under the Plan;[12] or (c) not agree to the treatment provided under the Plan.  Accordingly, to make an election regarding the treatment of their claim, a creditor simply had to review the brief Consent Form, check one of three boxes provided and return the Consent Form to the Debtors.  Of course, a creditor could also file an objection, but unlike under the TWA plan, this was not the only way for an administrative or priority creditor to elect not to agree to the treatment under the Plan.

The Debtors also facilitated the return of the Consent Forms to the maximum extent possible.  Creditors could mail the Consent Forms in self-addressed, prepaid envelopes provided by the Debtors, fax the Consent Form into a toll-free fax machine located in the Debtors offices, or even send in the election information via email to a dedicated email address set up by the Debtor solely for the purpose of collecting election information.  The Debtors also allowed creditors who called to make their election over the phone, with the conversation being taped with the party's permission.  See Tyson Affidavit, Confirmation Exhibit 5.

In addition, to ensure administrative and priority creditors were fully informed, the Debtors initiated an extensive communications campaign.  The Debtors created a Call Center staffed by 17 customer service representatives and claims managers accessible via a toll-free number between the hours of 7:30 a.m. and 7:00 p.m. Monday through Friday.  As an initial measure, the Call Center staff contacted all administrative and priority creditors prior to the mailing of the Consent Forms to alert the creditor to the impending arrival of the Information Packet containing the Consent Form.  In addition, while Consent Forms were outstanding, the

---

[12]  A creditor could elect to be treated as an Administrative Convenience claim and receive a one time payment of its allowed claim or $3,000, whichever is lower, in full satisfaction of its total General Administrative Expense or Priority Claim.

Call Center staff fielded incoming calls from creditors and also initiated contact with unresponsive creditors to answer questions and urge them to return the Consent Forms.

The Debtors' solicitation and communications efforts greatly simplified the process through which administrative or priority creditors could consent or object to the treatment of their claim under the Plan. Due in large part to these efforts, from the total of 454 Consent Forms mailed: (a) 85 creditors agreed to the pro rata treatment of their claims under the Plan; (b) 205 creditors elected to be treated as an Administrative Convenience Class; (c) 49 creditors settled their claims with the Debtors pursuant to stipulations or agreements; (d) 8 creditors remain who elected not to agree with the treatment provided under the Plan;[13] and (e) 107 creditors did not return the Consent Forms. Among the Debtors' protocols, the Debtors made two personal attempts to contact each of the creditors that failed to return a Consent Form.

As a result of all of the Debtors' efforts, 94.7% of the number of administrative and priority creditors either will be paid in full under the Plan, have settled their claims with the Debtors, or consented to the treatment afforded to each party under the Plan. Tyson Affidavit, Confirmation Exhibit 5 at p. 8. These parties hold over 93.5% of the asserted administrative and priority claims. Id.

The Debtors submit that under these circumstances, it is fair and appropriate to permit "deemed" consent here, particularly in light of the Debtors' comprehensive solicitation and communications efforts discussed above and the fact that the vast majority of these creditors

---

[13]   Subsequent to receiving Consent Forms from Holders who elected not to agree to the "different treatment" set forth in the Plan, the Debtors contacted each party and expect that as of the confirmation hearing, each such party will have either withdrawn its initial election or changed its election to agree with the treatment afforded under the Plan.

already were participants in these chapter 11 cases (by virtue of filing a claim or being scheduled a holder of a priority claim).

Similarly, "deemed consent" provisions for holders of administrative expense claims have been held valid in the context of a plan of reorganization under chapter 13. Several courts have interpreted section 1322(a)(2) of the Bankruptcy Code – with virtually identical language to section 1129(a)(9) of the Bankruptcy Code – and have held that the failure of an administrative expense creditor or priority creditor to object to full payment under a chapter 13 plan is the equivalent of an agreement or consent to treatment other than as provided in the Bankruptcy Code. In In re Facciponte, 1992 WL 722289 (Bankr. N.D.N.Y. 1992), the debtor proposed a Chapter 13 plan that provided for full (although deferred) cash payments to certain priority creditors – which is required under 11 U.S.C. § 1322(a)(2). Section 1322(a)(2) provides that a Chapter 13 plan shall:

> provide for the full payment, in deferred cash payments, of all claims entitled to priority under [11 U.S.C. § 507], unless the holder of the particular claim agrees to a different treatment of such claim …

Facciponte, 1992 WL 722289 at *1 (emphasis added). In interpreting this provision, the debtors in their Chapter 13 plan provided for:

> [f]ull payment in deferred cash payments of all claims entitled to priority under 11 U.S.C. 507 (sic), except that no payment shall be made to the New York State Department of Taxation and Finance (the "Department"). The failure of the Department to object to the confirmation of this plan shall constitutes (sic) an agreement by the Department to this different treatment of it's (sic) claim pursuant to 11 U.S.C. § 1322(a)(2).

Facciponte, 1992 WL 722289 at *1. The court held that the New York State Department of Taxation and Finance, by virtue of its failure to object to the plan, had agreed under section 1322(a)(2) to the proposed treatment of its claim. Id. at *2 ("Having remained silent, [the New York State Department] has agreed to the treatment of its claim as set forth in Debtor's plan").

Other courts have held similarly.  See, e.g., In re LaForgia, 1998 WL 59480 (Bankr. M.D. Pa. 1998) ("The better view is that the issue of compliance with section 1322(a), like other issues pertaining to whether a plan is confirmable, must be raised at the confirmation hearing or else they are barred.") (citing 8 Lawrence P. King, COLLIER ON BANKRUPTCY, 1327.02[1][c] at 1326-6, 7 (15th ed. rev. 1996)); In re Hebert, 61 B.R. 44, 46-47 (Bankr. W.D. La. 1986) (holding that the failure of the IRS, a priority tax creditor, to object to its treatment under a Chapter 13 plan did not provide for payment of such claim in full constituted its "agreement" to such treatment under section 1322(a)(2)).  Essentially, in the context of section 1322, the "general rule is that the acceptance of [a] plan by a …creditor can be inferred by the absence of an objection."  See In re Szostek, 886 F.2d 1405, 1413 (3rd Cir. 1989).

> **(b)      It is Consistent with Bankruptcy Code Policy for a Party to be Bound by the Terms of a Plan, Even if Such Party does not Affirmatively Agree to Such Treatment.**

Courts have held routinely that a party can be bound by the terms of a plan that treats the party's claim different from the treatment required under the Bankruptcy Code, even though the party did not affirmatively agree to such treatment.  See 11 U.S.C. § 1141(a).  In other words, a confirmed reorganization plan is binding even against parties who did not agree to its terms.  Thus, a party who chooses not to object to a plan's terms or provisions would waive its rights to press later objections based on section 1129(a)(9) of the Bankruptcy Code.  See Behles-Giddens v. Raft (In re K.D. Company), 254 B.R. 480, 491 (B.A.P. 10th Cir. 2000) ("Having not objected…BG must abide by the terms of the Confirmed Plan as interpreted by the bankruptcy court").  This holds true even where a plan provision may have been inconsistent with the Bankruptcy Code.  Id.; In re Anderson, 179 F.3d 1253, 1247-1258 (10th Cir. 1999) ("If a creditor fails to timely object to a proposed plan or appeal the confirmation order, it cannot

later complain about a certain provision contained in a confirmed plan, even if such provision

contained in a confirmed plan are inconsistent with the Code").

As, the Third Circuit has held, a creditor's right to receive payment in full under a

plan is waived if that creditor fails to object to a plan that provides less than full payment of such

claim.  In re Szostek, 886 F.2d at 1413.  In Szostek, a secured creditor failed to object to a

Chapter 13 plan that did not treat the secured claim as it allegedly should have been treated under

11 U.S.C. § 1325, and the Court held that once the plan was confirmed, it could not be

challenged as violative of the Bankruptcy Code.  Id.  The Third Circuit also cited the Tenth

Circuit's opinion in In re Ruti-Sweetwater, Inc., 836 F.2d 1263 (10th Cir. 1988), in which the

Court held that a creditor's inaction constituted acceptance of a plan:

> to hold otherwise would be to endorse the proposition that a creditor may sit idly
> by, not participate in any manner in the formulation and adoption of a plan in
> reorganization and thereafter, subsequent to the adoption of the plan, raise a
> challenge for the first time.  Adoption of (this) approach would effectively place
> all reorganization plans at risk in terms of reliance and finality.

Szostek, 886 F.2d at 1413 (citing Ruti-Sweetwater, 836 F.2d at 1266).

As these cases demonstrate, a fundamental principle of chapter 11 proceedings is

that once an interested party is given notice and an opportunity to be heard, the party bears the

burden of exercising its rights under the Bankruptcy Code and is expected to be vigilant in

protecting and exercising such rights.[14]  "This concept of proper 'notice and opportunity to be

---

[14]  Courts also have relied on the concept of "notice and opportunity to be heard" to find "deemed consent"
provisions proper in nonbankruptcy contexts as well.  For example, in Phillips Petroleum Co., v. Shutts, 472 U.S.
797 (1985), the U.S. Supreme Court upheld an opt-out procedure for class action suits and rejected requiring the
affirmative consent of absent plaintiff's to "opt-in" to the procedure.  In focusing on the issue of "how stringent the
requirement [was] for a showing of consent" by the absent plaintiffs, the Court held that the State of Kansas' "opt-
out" provision satisfied the due process clause of the Fourteenth Amendment of the U.S. Constitution where "fully
descriptive notice" was sent to each class member with an explanation of their right to "opt out."  Id. at 812.  The
Court stated that requiring the affirmative consent of each absent plaintiff would hinder judicial efficiency.  Id.
Moreover, other than "fully descriptive notice and opportunity to be heard, "the Constitution does not require more
(Continued…)

heard' is found throughout the Code and the Rules and has developed into perhaps the single

most useful procedural device to ensure the smooth functioning of the Bankruptcy Court."

Gabel, 61 B.R. at 664.  As stated further by the Court in Gabel, this concept

> "in practice contemplates that the trustee will be allowed to take many actions by simply giving the proper notice to the parties in interest.  If proper notice has been given the court will be required to intercede only when a party makes an expressed objection or request for a hearing….For this procedure to work, however, creditors must be alert to protect their own interests as their failure to react will often result in things being done which would be entitled to the same respect as a thing adjudged."

Id. at 665 [emphasis added] (noting that "one can lead a horse to water, but one

cannot make it drink").  This concept is also expressed in the legal maxim, applicable in these

cases: *Qui tacet consentire videtur, ubi tractatur de ejus commodo*, or "[h]e who keeps silent is

assumed to consent, when his interest is at stake."  Essentially, once a debtor provides notice and

an opportunity to be heard, i.e., to object, the responsibility to act shifts to the creditors, for

creditors are obligated to take an active role in protecting their claims.  See Szostek, 886 F.2d at

1414, citing In re Ruti-Sweetwater, Inc., 836 F.2d at 1263.[15]  This principle is even more

---

to protect what must be the somewhat rare species of class member who is unwilling to execute an "opt out" form, but whose claim is nonetheless so important that he cannot be presumed to consent to being a member of the class by his failure to do so." Id. at 813.  Consequently, the Supreme Court endorsed the deemed consent of absent plaintiffs in class actions suits so long as affected parties received notice and were given an opportunity to be heard, i.e., to "opt out."  It should be noted that even under the Due Process standard endorsed by the Supreme Court in Phillips, the Debtors' "deemed consent" provision withstands scrutiny because the Debtors' provided all affected administrative creditors with (1) "fully descriptive notice" in the Disclosure Statement, and (2) an opportunity to be heard, by simply completing and returning the Consent Forms.

[15]    Courts also have routinely held silence to be tantamount to deemed consent under other sections of the Bankruptcy Code.  For instance, courts have held that the failure of a creditor to object to a sale of property from a debtor is fairly deemed the creditor's "consent," authorizing the sale of estate property free and clear of all existing liens.  In In re Elliott, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) a creditor sought to set aside the sale of property that had been owned prior to sale by a chapter 7 debtor.  The bankruptcy court concluded that the creditor's failure to object to the sale of assets under section 363(f)(2) of the Bankruptcy Code was sufficient to find implied consent because the creditor, Citicorp Homeowners Services, Inc., had received notice of the proposed sale and had not filed any timely objection.  Id. at 345.  The court stated that "the law and jurisprudence in this areas leaves [the court] with the firm belief that [implied consent] is exactly the legal effect that must be given to such a failure to object." Id., citing In re Gabel, 61 B.R. 661 (Bankr. W.D. La. 1985); In re Shary, 152 B.R. 724, 725 (Bankr. N.D. Ohio
(Continued…)

---

appropriately applied in these cases because the failure to submit a Consent Form does not adversely affect the rights of an administrative or priority creditor. Rather, the treatment of a creditor who failed to return a Consent Form is the same as a creditor who affirmatively agreed to receive a pro rata distribution.

> **2.    The Fundamental Policy of Rehabilitation of Debtors in Chapter 11 Proceedings Supports the Treatment of General Administrative Claims and Priority Claims Provided in the Plan, and, Therefore, Confirmation of the Plan is in the Best Interests of All Parties Involved.**

The Plan is consistent with the core policy and the overriding purpose of rehabilitation of debtors in Chapter 11. This fundamental policy was articulated clearly by the United States Supreme Court in <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 514 (1984), stating that "[t]he fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." Courts in this district have embraced this policy. <u>See</u> <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 175 (Bankr S.D.N.Y. 1989) (acknowledging that "[t]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor).

The Debtors submit that fairness and equity also favor a decision that the Plan satisfies section 1129(a)(9). As described above, the Debtors have made extensive efforts to encourage parties to respond to the Consent Forms. The Debtors do not believe that there is a viable alternative for emerging from chapter 11 other than through the confirmation of the Plan. If the Plan is not confirmed, the Debtors believe that these Chapter 11 Cases will be converted to chapter 7 or dismissed. Based on negotiations with the Lenders, distributions are being made

---

1993) (creditor's failure to object to sale "implicitly conveyed" its consent to sale under section 363(f)(2) of the Bankruptcy Code).

available to Holders of General Administrative Claims, Priority Claims and Unsecured Claims pursuant to the Plan that would not be available if the cases were converted to chapter 7. In such case, over 1,800 creditors who would be paid some (or in the case of convenience creditors, all) of the claims would receive no distribution whatsoever.

> **J.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding The Acceptances of Insiders (Section 1129(a)(10))**

As required by section 1129(a)(10) of the Bankruptcy Code, at least one Class of Claims or Equity Interests that is impaired under the Plan has accepted the Plan. Holders of Claims in Class 4, the only non-insider class of impaired creditors that was entitled to vote on the Plan, accepted the Plan. <u>See</u> Confirmation Exhibit 6.

> **K.    The Plan Is Feasible (Section 1129(a)(11))**

Section 1129(a)(11) of the Bankruptcy Code requires the Court to find that the Plan is feasible as a condition precedent to confirmation. Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

It is well established that the Debtors must prove the Plan's feasibility by the preponderance of evidence. <u>Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)</u>, 994 F.2d 1160, 1165 (5th Cir. 1993) (rejecting "clear and convincing" as the applicable standard). The threshold of proof necessary to satisfy the requirement is relatively low. <u>In re Sea Garden Motel and Apartments</u>, 195 B.R. 294, 304 (Bankr. D. N.J. 1996) (quotations omitted). Under section 1129(a)(11) of the Bankruptcy Code, courts are merely required to determine whether a plan "offers a reasonable probability of success." <u>In re</u>

Landing Assoc., Ltd., 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) (no plan can offer absolute

certainty, and all that section 1129(a)(11) requires is that the plan offer a reasonable probability

of success); In re T-H New Orleans Ltd. Partnership, 116 F.3d 790, 801 (5th Cir. 1997) ("only a

reasonable assurance of commercial viability is required").  The Tenth Circuit has held that

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary
> schemes that promise creditors and equity security holders more under a proposed
> plan than the Debtor can possibly obtain after confirmation.  In determining
> whether a plan meets the requirements of 1129(a)(11)…the Bankruptcy Court has
> the obligation to scrutinize the plan carefully to determine whether it offers a
> reasonable prospect of success and is workable.

Travelers Ins. Co. v. Pikes Peak Water Co., (In re Pikes Peak Water Co.), 779 F.2d 1456, 1460

(10th Cir. 1985); Heartland Fed. Sav. & Loan, 994 F.2d at 1163 ("Only a reasonable assurance

of commercial viability is required"); The Mutual Life Ins. Co. of New York v. Patrician St.

Joseph Partners (In re Patrician St. Joseph Partners), 169 B.R. 669, 674 (Bankr. D. Ariz. 1994)

(plan meets feasibility standard if the plan offers a reasonable prospect of success and is

workable).  In re Texaco Inc., 84 B.R. at 910 ("[a]ll that is required is that there be reasonable

assurance of commercial viability").

The Plan satisfies the feasibility requirement imposed by section 1129(a)(11) of

the Bankruptcy Code.  The Debtors will emerge from chapter 11 and continue to exist as

Reorganized Teligent, which will have adequate capitalization and resources to operate.  All of

the Property of the Debtors (including operating assets of the fixed wireless and resale business,

licenses, certifications, cash, intangible assets, litigation claims, receivables and other assets)

other than the Claim Fund, the Chapter 5 Causes of Action and the Unsecured Claim Fund will

be vested in and become property of Reorganized Teligent.  Reorganized Teligent is expected to

be debt free and funded for at least two years.  The Court should find the Plan is feasible because

the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise

will have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of

administering and fully consummating the Plan and closing the Chapter 11 Cases.

**L.      The Plan Provides For The Payment Of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12))**

In accordance with section 1129(a)(12) of the Bankruptcy Code, Article XII.B of

the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930, as determined by

the Court at the hearing under section 1128 of Bankruptcy Code, on or before the Effective Date.

**M.      The Plan Complies With Section 1129(a)(13) Of The Bankruptcy Code**

Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits

continue to be paid post-confirmation at any levels established in accordance with section 1114

of the Bankruptcy Code.    11 U.S.C. § 1129(a)(13).    The Debtors never established retiree

benefits, as that term is defined in section 1114 of the Bankruptcy Code.    Because the Plan

provides for the maintenance of retiree benefits at levels established prior to the Confirmation

Date (i.e., zero), the Plan satisfies the requirement of section 1129(a)(13) of the Bankruptcy

Code.

**N.      The Plan is Fair and Equitable With Respect to Impaired Classes (Section 1129(b))**

In the event that any impaired Class of Claims does not accept the Plan, the Court

may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or

Equity Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is

"fair and equitable." 11 U.S.C. § 1129(b)(1).  Because Classes 1, 3, 5 and 6 are deemed to have

rejected the Plan, the Court may only confirm the Plan if the Plan "does not discriminate

unfairly" and is "fair and equitable" with respect to Classes 1,3, 5 and 6.

A chapter 11 plan does not discriminate unfairly, within the meaning of the

Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with

the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or equity interests.  In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988).

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims and equity interests.  With respect to a secured claim, "fair and equitable" means (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal in value to the allowed amount of its claim with a present value as of the effective date of the plan at least equal in value to such creditor's interest in the Debtors' interest in the property securing its claim, (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, the lien attaches to the proceeds of the sale, and such lien proceeds are treated in accordance with clause (i) or (iii) of this paragraph, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.  11 U.S.C. § 1129(b)(2)(A).

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired unsecured creditor receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed claim, or (ii) the holders of claims or interests that are junior to the claims or interests of the dissenting class will not receive or retain any property under the plan.  11 U.S.C. § 1129(b)(2)(B).

With respect to equity interests, "fair and equitable" means that each equity interest holder (a) will receive or retain property of a value, as of the effective date of the plan,

equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such

holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the

value of such interest; or (b) the holder of any interest that is junior to the interests of such class

will not receive or retain any property under the plan on account of such junior interest.   11

U.S.C. § 1129(b)(2)(C).

The Plan "does not discriminate unfairly" and is "fair and equitable" with respect

to Class 1.   The legal rights of Holders of Other Priority Claims in Class 1 are treated

consistently with the treatment of other classes whose legal rights are substantially similar, and

such Holders do not receive more than they legally are entitled to receive for their Claims.[16]   In

addition, the Holders of Claims and Equity Interests that are junior to the Holders of Other

Priority Claims in Class 1 (i.e., Holders of General Unsecured Claims in Class 5 and Holders of

Old Equity Interests in Class 6) will not receive or retain any property under the Plan.[17]

The Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders

of Other Secured Claims in Class 3.   The legal rights of Holders of Other Secured Claims in

Class 3 are treated consistently with the treatment of other classes whose legal rights are

---

[16]   The Plan provides for a convenience class for Administrative Convenience Claims and Priority Convenience Claims in an amount equal to or less than $3,000.   Holders of Convenience Claims will be paid their allowed claims (up to $3,000) in full in cash on or as soon as practicable after the Effective Date.   It is common for a debtor to create a convenience class under a plan for smaller claims. Providing for a convenience class reduces administrative costs by reducing the number of claims dealt with post-petition.  See In re The Way Apartments, D.T., 201 B.R. 444 (N.D. Tex. 1996) (finding the placement of unsecured trade creditors holding claims of less than $1,000 in a class of their own to be valid for purposes of administrative convenience under the Bankruptcy Code); In re Eagle-Picher Industries, Inc., 203 B.R. 256 (S.D. Ohio 1996) (holding the convenience class established under the plan to be reasonable and necessary for administrative convenience); In re South Aiken, Ltd., 121 B.R. 7 (Bankr. W.D. Pa. 1990) (holding that a plan may designate a separate class of claims that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience, and $20,000 figure set by the plan was reasonable).

[17]   Although Holders of General Unsecured Claims in Class 5 may receive a portion of the proceeds from the Chapter 5 Causes of Action, such distribution will occur outside of the Plan, as the Lenders have made this portion

(Continued…)

substantially similar, and such Holders do not receive more than they legally are entitled to receive for their Claims.  In addition, the Plan provides that each Holder, if any, of an Allowed Other Secured Claim will (i) be paid such Holder's Allowed Other Secured Claim in full in cash; (ii) be paid the sale or disposition proceeds of the property securing such Allowed Other Secured Claim, to the extent of the value of the Debtors' interest in such property; (iii) receive the property securing such Claim; or (iv) be paid such other distributions as necessary to satisfy the requirements of the Bankruptcy Code.  Such treatment under the Plan is in accordance with section 1129(b)(2)(A) of the Bankruptcy Code.

The Plan "does not discriminate unfairly" and is "fair and equitable" with respect to Class 5.  The legal rights of Holders of General Unsecured Claims in Class 5 are treated consistently with the treatment of other classes whose legal rights are substantially similar, and such Holders do not receive more than they legally are entitled to receive for their Claims.  In addition, although Holders of General Unsecured Claims in Class 5 will not receive or retain any property under the Plan, there is no class junior to Class 5 (i.e., Class 6-Old Equity Interests) that receives or retains any property under the Plan.

The Plan "does not discriminate unfairly" and is "fair and equitable" with respect to Class 6.  The legal rights of Holders of Old Equity Interests in Class 6 are treated consistently with the treatment of other classes whose legal rights are substantially similar, and such Holders do not receive more than they legally are entitled to receive for their Equity Interests.  In addition, although all Old Equity Interests will be canceled and extinguished and Holders of Old

---

of their recovery available to Holders of Allowed General Unsecured Claims in consideration for the Creditors' Committee's support of the Plan.

Equity Interests in Class 6 will not receive or retain any property under the Plan, there is no class junior to Class 6 that receives or retains any property under the Plan.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Plan complies with all requirements of the Bankruptcy Code, Bankruptcy Rules, local rules and Orders of this Court, and therefore the Debtors respectfully request that the Court confirm the Plan.


Dated:  September 3, 2002                        Respectfully submitted,


                                         /s/ Anup Sathy

                                        KIRKLAND & ELLIS
                                        Matthew N. Kleiman (MK-3828)
                                        Anup Sathy (AS-4915)
                                        Scott R. Zemnick (SZ-5551)
                                        200 East Randolph Drive
                                        Chicago, Illinois 60601
                                        (312) 861-2000

                                        <u>and</u>

                                        KIRKLAND & ELLIS
                                        James H.M. Sprayregen, P.C. (JS-7757)
                                        Jonathan S. Henes (JH-1979)
                                        Michael J. Frishberg (MF-5619)
                                        153 East 53rd Street
                                        New York, New York 10022-4675
                                        (212) 446-4800

                                        Counsel for Debtors and Debtors in Possession