| | |
|---|---|
| SIMPSON THACHER & BARTLETT<br>Steve Fuhrman  (SF 0898)<br>Robert Trust (RT 6660)<br>425 Lexington Avenue<br>New York, New York 10017<br>Telephone: (212) 455-2000<br>Fax:  (212) 455-2502<br>Attorneys for JPMorgan Chase Bank, as Agent | **Hearing Date: September 5, 2002**<br>**Hearing Time:  2:00 p.m.** |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re:                                                                   :   Case No.: 01-12974 (SMB)
                                                                              :
TELIGENT, INC., et al.,                                        :   Chapter 11
                                                                              :
                    Debtors.                                          :   Jointly Administered
                                                                              :
                                                                              :
-----------------------------------------------------------------x

### JOINDER OF THE SENIOR SECURED LENDERS IN THE DEBTORS' MEMORANDUM IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

TO THE HONORABLE STUART M. BERNSTEIN,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

JPMorgan Chase Bank, in its capacity as administrative agent (the "Agent") for itself and a syndicate of approximately fifty (50) senior secured lenders (collectively, the "Lenders") to the above-captioned debtors and debtors-in-possession herein (collectively, the "Debtors"), hereby submits this joinder (the "Joinder") in the Debtors' Memorandum (the "Debtors' Memorandum") in Support of Confirmation of the Third Amended Joint Plan of Reorganization (the "Plan"),[1] and in support hereof respectfully represents as follows:

---

1    Unless otherwise defined herein, capitalized terms are used herein as defined in the Plan.

## PRELIMINARY STATEMENT

1.      As the holders of the largest administrative claims (in excess of $75 million of superpriority administrative claims as of the date hereof) and prepetition secured claims (approximately $800 million as of the Petition Date) against the Debtors, the Lenders support confirmation of the Plan and join in the Debtors' Memorandum.  This support is really not based upon the Lenders' economic self-interest because confirmation of the Plan is not expected to enhance the Lenders' likely single digit recovery in these Chapter 11 cases.   In fact, the projected percentage recovery under the Plan to holders of administrative and priority claims, all of which are junior to the Lenders' superpriority liens and administrative claims, will in all likelihood *exceed* the recovery under the Plan to the Lenders.  Nevertheless, the Lenders support confirmation of the Plan because in connection with the Debtors' good faith efforts throughout these Chapter 11 cases to maximize the recovery to all creditors, the Debtors, the Lenders and the Official Committee of Unsecured Creditors (the "Committee") negotiated a consensual Plan that facilitates the Debtors' efforts to effectuate a reorganization around a small wholesale business while providing a recovery to all holders of allowed claims.  Pursuant to these negotiations, the Lenders agreed, among other things, to make available (i) $4 million to pay administrative and priority claims, (ii) $350,000 to fund the pursuit of Chapter 5 Causes of Actions, the proceeds of which the Lenders agreed to share with the holders of unsecured claims and (iii) $10 million to fund the Reorganized Debtors after the Effective Date.   As set forth in the Disclosure Statement, absent the agreement of the Lenders set forth in the Plan, no creditors other than those covered by the Carveout would receive any recovery under the Plan in light of the fact that all of the Debtors' assets (including the Chapter 5 Causes of Action) are subject to the Lenders' prepetition liens and postpetition superpriority liens and claims.

2. The Lenders also support the Plan because the Debtors have worked diligently in pursuit of confirmation of the Plan and endeavored to resolve all of the outstanding issues and objections in connection with the Plan. The Debtors have advised the Lenders that the Debtors expect to be able to inform the Court at the Confirmation Hearing that all pending objections (including any previously delivered rejections by holders of administrative and priority claims) to confirmation of the Plan have been resolved. Thus, notwithstanding the anticipated absence of any pending objection to confirmation of the Plan, the only potential roadblock is the failure of certain holders of administrative and priority claims to respond to the Debtors' repeated requests to indicate whether they will agree to the "different treatment" proposed under the Plan.

3. For the reasons set forth below, and more fully set forth in the Debtors' Memorandum, the Lenders submit that the failure of certain of such creditors to affirmatively respond should not, as a matter of law or fundamental fairness, prevent confirmation of the Plan. The facts and circumstances supporting the Debtors' request to deem those holders of administrative and priority claims who failed to respond to have agreed to the "different treatment" under the Plan are particularly compelling here because notwithstanding the failure of such creditors to respond, those holders will still receive the same recovery as those who did respond, and because the recovery to creditors (except potentially the Lenders) under an alternative scenario would be *less* than that under the Plan. Accordingly, under the facts and circumstances of this Plan and these Chapter 11 cases, the Lenders submit that the Debtors have satisfied the requirements of Section 1129(a)(9) of the Bankruptcy Code and the Plan should be confirmed.

**BACKGROUND**

4.  On May 21, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are continuing in possession of their property, and are operating and managing their businesses, as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On May 30, 2001, the Committee was appointed.

5.  As of the Petition Date, Teligent, Inc. (the "Company") was liable to the Lenders in respect of loans made by the Lenders pursuant to the Credit Agreement, dated as of July 2, 1998 (as amended, supplemented or otherwise modified prior to the Petition Date, the "Credit Agreement"), among the Company, the Lenders and the Agent, in the aggregate principal amount of approximately $800 million (the "Prepetition Obligations"). The Prepetition Obligations are secured by first priority liens and security interests upon and in substantially all of each Debtor's assets and property. As of the Petition Date, the Agent held approximately $100 million in a collateral account pledged to the Agent for the ratable benefit of the Lenders. Pursuant to the Final Order (I) Authorizing the Use of Lenders' Cash Collateral and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 entered by this Court on June 13, 2001 (the "Cash Collateral Order"), the Court granted final approval to the Debtors to use the Lenders' cash collateral on a consensual basis to fund the Debtors' operations and to provide adequate protection to the Lenders with respect to any diminution in value of the Lenders' interests in the Prepetition Collateral (as defined in the Cash Collateral Order). As of the date hereof, the Debtors are liable to the Lenders in the aggregate principal amount in excess of $75 million in respect of Postpetition Loans under the Cash Collateral Order (as defined therein), which were granted superpriority administrative expense status pursuant to Section 507(b) of the

Bankruptcy Code. Accordingly, the Lenders are the holders of by far the largest administrative claims against the estates in these Chapter 11 cases.

6. As the Court is aware, the Debtors and their advisors endeavored to sell all or substantially all of the Debtors' assets relating to their "core" operations since the Petition Date. With the termination in mid-November of the proposed TAC transaction, it became clear that a sale would not be possible, and the Debtors immediately obtained authority from this Court to shut down retail service in all remaining operating markets. After terminating their retail operations and selling all of their enterprise subsidiaries, the Debtors were successful in negotiating with the Lenders and the Committee a consensual Chapter 11 plan which would allow the Debtors to reorganize around a small wholesale business. Even though the Lenders will not fully recover on account of their Postpetition Loans or at all on the Prepetition Obligations, the Lenders have agreed to make available (i) $4 million to pay administrative and priority claims, (ii) $350,000 to fund the pursuit of Chapter 5 Causes of Actions, the proceeds of which the Lenders agreed to share with the holders of unsecured claims and (iii) $10 million to fund the Reorganized Debtors after the Effective Date.

7. In light of the less than 100% payment proposed under the Plan to holders of administrative and priority claims from the Claim Fund, the Debtors undertook to solicit the agreement of such holders to the treatment proposed under the Plan by means of a consent form approved by the Court (the "<u>Consent Form</u>"). As a result of the Debtors' efforts, 94.7% of the number of administrative and priority creditors will be paid in full under the Plan, have settled their claims with the Debtors or consented to their treatment under the Plan. These parties hold over 93.5% of the asserted administrative and priority claims (Debtors' Memorandum, p. 29).

8. As set forth in greater detail in the Debtors' Memorandum and the accompanying affidavits, the Debtors provided a simple process and several different avenues through which holders of administrative and priority claims could agree to the treatment of their claims under the Plan. The Debtors distributed the two-page Consent Form, which described the treatment provided for such creditors' claims under the Plan, and requested that the creditor check one of three boxes indicating whether the creditor (1) agreed to the treatment, (2) elected to be treated as a holder of an Administrative Convenience Claim, or (3) did not agree to the treatment. Furthermore, the Consent Form clearly stated that failure to respond would be deemed acceptance of the different treatment of such claims. Creditors could mail the Consent Forms in self-addressed, prepaid envelopes, fax the consent form to a toll-free fax number, or e-mail the election information to a dedicated e-mail address. In addition to the Consent Forms, the Debtors set up a Call Center staffed with personnel who alerted administrative and priority creditors to the fact that the Consent Forms were on their way, fielded calls from creditors, and urged unresponsive creditors to return their Consent Forms. Despite the Debtors' diligent and repeated efforts to contact all such holders of administrative and priority claims in order to provide them with an opportunity to agree to the Plan's treatment of their claims, a number of creditors have failed to provide any response whatsoever.

## DISCUSSION

9. The Lenders join in the legal arguments set forth in the Debtors' Memorandum. The Lenders submit that under the particular facts and circumstances of these Chapter 11 cases, including the use of a specifically designed Consent Form and a targeted communications campaign, holders of administrative and priority claims that failed to respond

should be deemed to have agreed to the "different treatment" set forth under the Plan in satisfaction of Section 1129(a)(9) of the Bankruptcy Code.

10. Section 1129(a)(9) provides, in relevant part, that "[e]xcept to the extent that the holder of a particular claim has agreed to different treatment of such claim," a plan must provide for full payment of all administrative and priority claims. The Plan, the Disclosure Statement and the Consent Forms all clearly state that at the confirmation hearing the Debtors will ask the Court to hold that the failure to return the Consent Form or to object to confirmation of the Plan by a holder of an administrative or priority claim shall be deemed to be such holder's consent and agreement to the Plan's treatment of such claim. Disclosure Statement Sections III.B.1 and B.3; Plan Article II, Sections A and C; Consent Forms.

11. Just such a provision was recently upheld by the Delaware Bankruptcy Court in In re Trans World Airlines, Inc. et al., Case No. 01-0056, Transcript Of Hearing at 10-15 (Bankr. D. Del. June 14, 2002).[2] The plan of reorganization in that case provided that failure to object to the confirmation of the plan by administrative and priority claim holders would be "deemed to be such Holder's agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9)." Third Amended Joint Liquidating Plan Of Reorganization Of The Debtors And The Official Committee Of Unsecured Creditors Pursuant To Chapter 11 Of The United States Bankruptcy Code (the "TWA Plan"), Sections III.A, B and C.[3] In confirming the TWA Plan over a pending objection filed by the Office of the United States Trustee, Chief Judge Walsh held:

---

2   A copy of the transcript is attached as an exhibit to the Debtors' Memorandum.

3   A copy of the relevant portion of the TWA Plan is attached as an exhibit to the Debtors' Memorandum.

**Section 1129(a)(9) does not require the agreed acceptance of a different treatment to be done on an individual claim-by-claim, 'affirmative agreement'...**

Transcript of Hearing at 11-12. Similar to the Debtors' efforts in these Chapter 11 cases, the court further noted that TWA "spelled out in numerous places . . . exactly what the purpose and effect of the, quote, 'deemed acceptance' closed quote, provision was," and that filing an objection was "not at all complicated or difficult." Id. at 12. All of the factors underpinning the court's decision in the TWA matter apply here with equal if not even greater force because the Debtors have solicited the agreement of administrative and priority creditors by means of a Court-approved Consent Form, facilitated responses through a targeted communications campaign and made efforts far beyond those apparently made by the parties in TWA to contact holders of administrative and priority claims.

12. The creditors who have chosen to "sit on their hands" in the face of the Debtors' repeated attempts to solicit their response to the Plan should not be permitted to prevent the Debtors' reorganization under Chapter 11. See In re Andersen, 179 F.3d 1253, 1257 (10th Cir. 1999) ("A creditor cannot simply sit on its rights and expect that the bankruptcy court or trustee will assume the duty of protecting its interests"); In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir. 1988) (non-voting, non-objecting creditors inaction held to be acceptance of Chapter 11 plan). Courts have recognized that failure to object to a plan is "the equivalent of an agreement or a consent to treatment different than provided for by the Code." In re LaForgia, Nos. 5-95-00036, 5-95-00976, 1998 WL 59480 at *3 (Bankr. E.D. Pa. 1998) (citing cases). If the Plan cannot be confirmed based upon the failure of certain creditors to respond, the Chapter 11 Cases will likely be converted to Chapter 7, in which case all holders of administrative and priority claims to be paid under the Plan will likely receive no distribution. Moreover, as set

forth in the Disclosure Statement, there is little or no prospect of an alternative Chapter 11 plan that would differ in any meaningful way from this Plan because substantially all of the Debtors' assets have already been liquidated and are subject to the Lenders' liens and claims. Disclosure Statement Section V. In short, the Plan is the best alternative for all creditors under the circumstances, and should not be scuttled solely due to the silence of creditors who have had every opportunity to object to the treatment of their claims.

13. Furthermore, the failure of any administrative or priority creditor to affirmatively indicate their agreement to the treatment proposed under the Plan does not result in discriminatory treatment or the forfeiture of any rights (unlike for example where a creditor fails to timely file a proof of claim or object to a sale free and clear of liens under Section 363(f)); in fact every administrative and priority creditor which failed to respond to the Consent Form will still participate in the $4 million Claim Fund in the same manner as if they had responded. Indeed, it may simply be that those creditors who did not respond did so because they knew from the Consent Form that the Debtors would request that the Court hold that their failure to respond would be deemed consent to the treatment afforded under the Plan and, therefore, they would receive the same treatment as those who did respond. Accordingly, the Lenders submit that there is no prejudice to deeming the failure of such administrative and priority creditors that failed to respond to be their consent to receive the "different treatment" proposed under the Plan on account of their claims.

## **CONCLUSION**

14.  For the reasons set forth above, the Lenders respectfully join in the Debtors' Memorandum and request that this Court confirm the Plan.

Dated:  September 4, 2002
         New York, New York

> Respectfully submitted,
>
> SIMPSON THACHER & BARTLETT
>
> s/ Steve Fuhrman
> Steve Fuhrman  (SF 0898)
> Robert Trust (RT 6660)
> 425 Lexington Avenue
> New York, New York 10017
> (212) 455-2000