UNITED STATES BANKRUPTCY COURT      **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
---------------------------- X
                             :
In re:                      :       Chapter 11
                             :       Case No. 01-12974 (SMB)
       TELIGENT, INC.,       :       (Substantively
                             :        Consolidated)
           Reorganized Debtor. :
----------------------------X

## OPINION AND ORDER GRANTING
## MOTION TO COMPEL INTERIM ACCOUNTING
## AND DENYING SANCTIONS

**A P P E A R A N C E S:**

McCARTER & ENGLISH, LLP
Attorneys for First Union National Bank,
    n/k/a Wachovia Bank, N.A., as Indenture Trustee
245 Park Avenue, 27th Floor
New York, New York 10022-7402

       David J. Adler, Esq.
          Of Counsel

JOHN J. PREEFER, ESQ.
Attorney for Aspen Partners -
    Series A of Aspen Capital Partners, LP
60 East 42nd Street, Suite 1201
New York, New York 10165

       John J. Preefer, Esq.
          Of Counsel

SAVAGE & ASSOCIATES, P.C.
Attorneys for the Unsecured Claims
    Estate Representative
56 Lafayette Avenue
White Plains, New York 10603

       Denise L. Savage, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

First Union National Bank, n/k/a Wachovia Bank, N.A. ("First Union") and Aspen Partners - Series A of Aspen Capital Partners, L.P. ("Aspen", and collectively, the "Movants") moved to compel an interim accounting by Savage & Associates, P.C., the Unsecured Claims Estate Representative (the "Representative"). The Representative disputed the Movants' standing, questioned their motives, and in turn, moved for sanctions. The Movants responded with their own request for sanctions. For the reasons that follow, the motion to compel an interim accounting is granted, and the motions for sanctions are denied.

**BACKGROUND**

**A.    The Teligent Case and the Plan**

At all relevant times, Teligent, Inc. was engaged in the business of providing telecommunications services to wholesale and resale customers. See In re Teligent, Inc., 282 B.R. 765, 766-67 (Bankr. S.D.N.Y. 2002). Teligent and over twenty affiliates (collectively, "Teligent") filed chapter 11 petitions in this Court on May 21, 2001. At the time of the filings, Teligent owed approximately $800 million to its banks and another $740 million to its public noteholders. Id. at 767. Teligent confirmed its Third

2

<u>Amended Joint Plan of Reorganization Under Chapter 11 of the</u>
<u>Bankruptcy Code</u> (the "Plan") on September 6, 2002, and the Plan became effective on September 12, 2002. <u>In re Teligent, Inc.</u>, 306 B.R. 752, 755-56 (Bankr. S.D.N.Y. 2004).

No money was available for distribution to the unsecured creditors. Instead, the Plan created the Representative, and transferred the "Chapter 5 Causes of Action" and a $300,000.00 "Unsecured Claim Fund" to the Representative. (<u>Plan</u>, Art. III, ¶B.5(b).) Teligent funded the Unsecured Claim Fund, and the Representative was empowered to use it to "discharge its responsibilities under the Plan." (<u>Id.</u>, Art. I, ¶ B.70.) Those responsibilities included pursuing the "Chapter 5 Causes of Action," (<u>id.</u>, Art. I, ¶ B.69), and distributing the funds, first to reimburse the Reorganized Debtor, and then, <u>pro rata</u>, to the holders of general unsecured claims. (<u>Id.</u>, Art. III, ¶ B.5(b); Art. VI, ¶ B.2.) In addition, the Representative was charged with reviewing, and where appropriate, objecting to unsecured claims. (<u>Id.</u>, Art. I, ¶ B.69.)

**B.    The Appointment Agreement**

Although the Plan created the Representative, it did not identify who it would be. Instead, the Plan provided that the Representative would be appointed by the Official Committee of

Unsecured Creditors (the "Committee"), or in certain circumstances, by Teligent. (Plan, Art. I, ¶ B.69.) By agreement, dated September 12, 2002 (the "Appointment Agreement"), among the Committee, JP Morgan Chase Bank, Reorganized Teligent and Bloom, Borenstein & Savage, P.C., the latter was appointed Representative. (Appointment Agreement, at RECITALS, p.1, ¶ 4.) Savage & Associates, P.C. subsequently replaced Bloom, Borenstein & Savage, P.C. Denise L. Savage, Esq., a shareholder of both firms, has effectively served as the Representative since September 12, 2002.

The Appointment Agreement also addressed the Representative's compensation, which she earned in one of two ways. She was entitled to receive a one-third contingency fee in connection with funds recovered through the litigation of Chapter 5 Causes of Action, (id., Art. II(a)), and hourly compensation for the claims-related work. (Id., Art. II(b).) The Representative was also entitled to reimbursement for her reasonable and necessary expenses, but not, at least in some circumstances, for "general overhead." (Id., Art. II(a)(3).)

The Appointment Agreement directed the Representative to deposit the proceeds of litigation "in a segregated trust account . . . maintained in compliance with applicable state laws and this

4

Agreement." It also authorized her to withdraw her compensation once the payment cleared. (<u>Id.</u>, Art. II(a)(2).) The Representative was not required to seek court approval of her fees and expenses under the Appointment Agreement, but "the Bankruptcy Court shall retain jurisdiction to resolve any dispute." (<u>Id.</u>, Art. II(d).)

Article III of the Appointment Agreement established certain reporting requirements. The Representative had to provide monthly reports to the other signatories. (<u>Id.</u>, Art. III(a).) Neither Movant, however, was a signatory. (<u>See</u> <u>id.</u>, at page 6.) In addition, the Representative agreed "to maintain and reconcile all trust accounts in accordance with applicable state law and the Rules of Professional Responsibility." (<u>Id.</u>, Art. III(b).)

Finally, Article IV addressed termination. Any unsecured creditor or Reorganized Teligent could file an application with the Court to remove the Representative. The Appointment Agreement did not identify the basis for removal.

The Appointment Agreement was never presented to the Court for approval, and the Court never approved it.

**C.    Litigation Leading up to the Initial Accounting Motion**

In 1997 and 1998, Teligent, Inc. issued notes (the "Notes")
totaling approximately $740 million.  First Union was appointed
Indenture Trustee.  Aspen currently owns approximately $230 million
of the Notes.  On November 13, 2002, First Union filed proofs of
claim 2220 and 2221 for the entire debt.  The Representative
objected to the two claims, and sought to recharacterize the debt
as equity or subordinate the claims to the other unsecured claims
(the "Noteholder Objection").  In its opposition, First Union
complained about the amount of fees that the Representative was
charging the trust, and insisted that she file a fee application.

In a decision rendered from the bench and subsequently
memorialized, the Court overruled the Noteholder Objection.  See In
re Teligent, Inc., Case No. 01-12974, slip op. (Bankr. S.D.N.Y.
Dec. 6, 2004) (ECF Doc. # 2157).  As the Appointment Agreement was
not part of the record, First Union was directed to submit it, and
First Union's application was adjourned to January 11, 2005.  Id.
at 11-12.

**D.    The Accounting Motions and the Representative's Productions**

Instead of providing a copy of the Appointment Agreement,
First Union, joined by Aspen, filed a motion to compel an

6

accounting and remove the Representative ("Initial Accounting Motion").[1]  The motion complained that lack of oversight left the Representative unchecked, and allowed her to pursue frivolous and wasteful litigation, including the appeal from the order overruling the Representative's objection to the First Union claims.  (See Initial Accounting Motion, at 2-3.)

Although the Representative disputed the Movants' right to an accounting, she turned over two boxes of documents on January 10, 2005.  The Representative maintained that the production contained all of the bank statements relating to the Teligent trust account, including funds collected from the Representative's prosecution of the avoidance actions, all funds paid out from the account, timeslips, and invoices for expenses.  (See The Unsecured Claim Estate Representative's _Supplemental Objection_ [etc.], dated Jan. 31, 2005 ("Supplemental Objection"), at ¶¶ 7-8)(ECF Doc. # 2213). She insisted that it provided a full and complete accounting.

According to the Representative's Supplemental Objection, she had recovered $10,046,712.60 as of January 31, 2005.  From this

_____

[1]    See Joint Motion of First Union National Bank as Indenture Trustee and Aspen Partners - Series A of Aspen Capital Partners, L.P.  Seeking an Accounting as Well as Other Relief Against the Unsecured Claims Estate Representative Including Removal and Appointment of a Successor Representative, dated Dec. 30, 2004 ("Initial Accounting Motion") (ECF Doc. # 2183).

7

amount, she had withdrawn $3,348,904.20 in contingency fees, paid herself additional fees of $186,750.00 for the claims related work, and reimbursed herself $546,627.61 in expenses.  In addition, she had paid mediation fees in the sum of $64,960.00, and litigation related expenses in the sum of $433,758.00, all from the funds in the trust account.  (<u>Id.</u>, at ¶ 21.)  The Representative also repaid the $300,000.00 loan that formed the basis of the Unsecured Claim Fund, and another $1.2 million to the secured lenders.  This left a balance on hand of $3,965,713.00.  (<u>Id.</u>)

The Movants were dissatisfied with the production, and filed an amended joint motion (the "Amended Accounting Motion").[2]  The new motion repeated the general wasteful litigation charge and highlighted two new and more specific deficiencies.  First, the Representative failed to produce a complete set of bank statements or a summary sheet, (<u>Amended Accounting Motion</u>, at ¶ 27), and based on their own reconstruction of the records, the Representative could not account for approximately $1.15 million that she should have been holding.  (<u>Id.</u>, at ¶¶ 32-33.)  The calculation used numbers that the Movants had gleaned from Representative's

---

[2]    <u>See</u> <u>Amended Joint Motion of First Union National Bank as Indenture Trustee and Aspen Partners – Series A of Aspen Capital Partners, LP Seeking an Accounting as Well as Other Relief Against the Unsecured Claims Estate Representative Including, If Warranted, Removal and Appointment of a Successor Representative</u>, dated Jan. 21, 2005 ("<u>Amended Accounting Motion</u>") (ECF Doc. # 2203).

objection to the Initial Accounting Motion, (see The Unsecured Claims Estate Representative's (I) Objection to . . . Motion Seeking an Accounting [etc.], dated Jan. 6, 2005 ("Representative's Initial Objection") (ECF Doc. # 2189)), and certain disclosures contained in e-mail correspondence between the parties. (Amended Accounting Motion, at ¶ 32.)

Second, the Movants charged that the Representative had deducted excessive and improper fees and expenses from the trust funds. These included fees for pursuing frivolous objections, such as the Noteholder Objection, (id., at ¶¶ 45-49), and the payment of general overhead expenses, such as $100,000.00 in temporary staff payroll, commuter expenses during regular business hours, inappropriate meals, office supplies, and several unidentified overtime expenses. (Id., at ¶¶ 38, 41-42.) As a result, the Movants reasserted their demand for a formal accounting as well as an itemized statement of all fees and expenses.[3] (Id., at ¶ 35.)

The Court heard the motion on February 3, 2005. Following the hearing, the Representative provided additional information.[4] As

---

[3]    The Movants also argued that the Representative should have to obtain Court approval for all legal fees and expenses. This specific request is subsumed within the more general request for an accounting, and is discussed in the succeeding text.

[4]    See Affidavit of Denise L. Savage, sworn to Feb. 15, 2005 ("Savage Affidavit") (ECF Doc. # 2235).

of December 31, 2004, the Representative had collected $10,207,322.37, (<u>Affidavit of Stuart Myers</u>, sworn to Feb. 14, 2005, Ex. A) (ECF Doc. # 2236), and had disbursed $8,180,985.06. (<u>Id.</u>, at Ex. C.) Through October 14, 2004, she had collected $8,759,358.57 and earned $2,916,866.40 in contingency fees, (<u>Savage Affidavit</u>, Ex. D, at 151), and through October 13, 2004, she had paid her firm $145,999.21 in fees for claims reconciliation work, (<u>id.</u>, Ex. B, at 10), and $505,646.77 in reimbursed expenses.[5] (<u>Id.</u>, Ex. C, at 78.)

Though the second production once again failed to satisfy the Movants, it limited the issues still in contention. Most notably, the Movants conceded that the fees, expenses, and income now balanced, essentially withdrawing their prior argument concerning a balance discrepancy. (<u>See</u> <u>Statement of First Union National Bank as Indenture Trustee in Response to the Affidavit [etc.]</u>, dated Feb. 23, 2005 ("<u>Movants' Response</u>"), at 2) (ECF Doc. # 2243). They continued, however, to assert that the Representative had charged general overhead expenses, including fees for clerical staff and charges for meals, to the trust in violation of the Appointment Agreement. (<u>See</u> <u>id.</u>)

---

[5]    The February production also included separate exhibits showing collections and payments through different end dates. (<u>Savage Affidavit</u>, Ex. E, F, G, H.)

**E.    The Representative's Opposition to the Motions**

In the Representative's Initial Objection, the Representative's Supplemental Objection, and most recently, in the Representative's objection to the Movant's Response, (see <u>Unsecured Claims Estate Representative's Response to Unauthorized Statement Filed by First Union National Bank as Indenture Trustee</u>, dated Feb. 23, 2005 ("<u>Representative's Final Response</u>") (ECF Doc. # 2245)), the Representative has asserted the same general arguments.

1.    The Movants' lack standing to demand an accounting because their status as general unsecured creditors is still in dispute.  The Representative appealed the order overruling the Noteholder Objection, and maintains that they are not creditors until the appeal is finally resolved.  (<u>See, e.g.</u>, <u>Representative's Initial Objection</u>, at 14-15.)

2.    The Appointment Agreement does not impose a duty to submit fee applications in the absence of a <u>bona fide</u> dispute, and no <u>bona fide</u> dispute exists.  (<u>Representative's Supplemental Objection</u>, at 25-29.)  In any event, the fees are appropriate because the Representative is paid on a contingency basis, and does not benefit from pursuing wasteful or frivolous litigation.  (<u>Id.</u>, at 29-30.)

11

3.     The accounting motions have been rendered moot because the Representative has already provided a full and complete accounting on two occasions. (<u>Representative's Final Response</u>, at ¶¶ 3-4, 19.) Moreover, these accountings have justified the expenses challenged by the Movants.

4.     The Movants are motivated by ill will, and are intent on intimidating, harassing and besmirching the Representative in response to her claims objection and the subsequent appeal. (<u>Representative's Supplemental Objection</u>, at ¶¶ 22-23.) The Movants "are simply attempting to harass the Representative until the Representative abandons the Appeal for fear of the risk posed by the [Movants' Amended Accounting Motion] that the Representative might not be paid." (<u>Id.</u>, at ¶ 23.) The Movants could have requested an accounting prior to filing the accounting motions, but failed to do so.

## DISCUSSION

**A.   Movants' Right to Demand an Accounting:**

**1.   General Duty of a Trustee to Render an Accounting:**

"A trustee is under a duty to the beneficiaries of the trust to keep clear and accurate accounts. His accounts should show what he has received and what he has expended." IIA AUSTEN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 172, at 452 (4th ed. 1987)

("SCOTT ON TRUSTS")(footnote omitted); accord Frontier Excavating, Inc. v. Sovereign Construction Co., 294 N.Y.S.2d 994, 998 (N.Y. App. Div. 1968); In re Steinberg's Estate, 274 N.Y.S. 914, 916-917 (N.Y. Surr. Ct. 1934); see 106 N.Y. JUR. 2D, TRUSTS § 360, at 413 (1993)("An essential element of a trust is accountability of the trustee for his or her administration.  Once a valid trust is created, accountability must inevitably follow.")(footnotes omitted).  The failure to keep proper accounts may result in the denial of compensation or in the trustee's removal.  IIA SCOTT ON TRUSTS § 172, at 454.

The trustee "must render an accounting when called on to do so at reasonable times by the beneficiaries."  IIA SCOTT ON TRUSTS § 172, at 454; accord Mason Tenders District Council Welfare Fund v. Logic Constr. Corp., 7 F. Supp. 2d 351, 358 n.44 (S.D.N.Y. 1998) (citing RESTATEMENT (SECOND) OF TRUSTS § 173 for proposition that a trustee has a duty to render an accounting and to provide complete and accurate information and documents relating to the trust upon request of the beneficiaries); In re Lloyd's American Trust Fund Litigation, 954 F. Supp. 656, 678 (S.D.N.Y. 1997) (beneficiaries of the trust have a general right to demand an accounting).[6]  "An allegation of

---

[6]    The trustee is also under a separate "duty to the beneficiaries to give them on their request at reasonable times complete and accurate information as to the administration of the trust." IIA SCOTT ON TRUSTS § 173, at 462 (footnote omitted); accord Frontier Excavating, 294 N.Y.S.2d at 998.  "The beneficiaries are entitled to know what the trust property is and how the

wrongdoing is not an indispensable element of a demand for an accounting where the complaint indicates a fiduciary relationship between the parties or some other special circumstances warranting equitable relief." Morqulas v. J. Yudell Realty, Inc., 554 N.Y.S.2d 597, 600 (N.Y. App. Div. 1990); accord Norwest Fin., Inc. v. Fernandez, 86 F. Supp. 2d 212, 234 (S.D.N.Y.), aff'd, 225 F.3d 646 (2d Cir. 2000)(unpublished op.).  The trustee bears the burden of establishing the legitimacy of the transactions relating to the trust property.  See In re Application of Garson, 774 N.Y.S.2d 644, 646 (N.Y. Sup. Ct. 2003) (citing Gordon v. Bialystoker Center & Bikur Cholim, Inc., 385 N.E.2d 285 (N.Y. 1978)).

The Representative's status as a trustee is not open to serious question, and hence, she is subject to the trustee's general duty to render an account.  Cf. In re Palm Coast, Matanza Shores Ltd. P'ship, 101 F.3d 253, 257 (2d Cir. 1996)(Court may look to common law of trusts for guidance in interpreting bankruptcy trustee's powers and obligations under the Bankruptcy Code).  The Plan, in combination with the Appointment Agreement, direct the Representative to hold the proceeds of the litigations in a segregated trust account, and distribute the net proceeds to the unsecured creditors.  Moreover, the Representative has already recovered over $10 million and disbursed approximately $8 million,

---

trustee has dealt with it." IIA Scott on Trusts § 173, at 462-64.

including over $4 million to herself in fees and reimbursed expenses.

The Representative's opposition to the request for an accounting lacks merit. The Movants are among the largest unsecured creditors, and have standing to insist on an accounting. The Court previously overruled the Noteholder Objection. Even if those claims are still "disputed" because the Representative appealed from that ruling, the definition of "claim" includes a "disputed" right to payment, <u>see</u> 11 U.S.C. § 101(5)(A), and "creditor" includes anyone who holds a pre-petition "claim." 11 U.S.C § 101(10)(A). The Representative is obligated to reserve funds to pay First Union's claims, and the Movants have the right to insist that the Representative comply with her duties as a trustee. They are beneficiaries of the trust administered by the Representative, and have a substantial interest in assuring that the Representative deals with trust property in accordance with the law.

Furthermore, the Appointment Agreement does not shield the Representative, or limit the Movants' right to demand an accounting. The Representative's existence, and her powers and duties, spring from the Plan. The Plan states that after repayment of the $300,000.00 advance, the remaining proceeds will be

15

distributed pro rata to the holders of unsecured claims (Plan, Art.
III.B.5(b); Art. VI.2 ("The [Representative] shall make
distributions to Holders of Allowed Unsecured Claims in the manner
set forth herein.").) In addition, the confirmation order states
that "[t]he Unsecured Claim Estate Representative shall make
distributions to Holders of Allowed Unsecured Claims in the manner
set forth in the Plan." (Order Confirming Debtors' Third Amended
Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy
Code, dated Sept. 6, 2002, at ¶ II(D)(7))(ECF Doc. # 1228.)
Finally, the Plan recites that the lenders contributed the Chapter
5 causes of action, which stood as collateral for their claim,
"[i]n consideration for the Creditors' Committee support of the
Plan." (Plan, Art. III.B.5(b).) The Representative's argument
that the Chapter 5 causes of action were "gifted" by the lenders,
that the proceeds will be distributed outside of the Plan, or that
the Appointment Agreement governs their distribution, (see
Supplemental Objection, at 26), is without merit.


     The Appointment Agreement, in this regard, was not mentioned
in or authorized by the Plan. Nor was it approved by the Court.
In short, it is not the document that created the trust that the
Representative administers. Whatever force it may have, it does
not absolve the Representative of obligations expressly or
impliedly imposed under the Plan. The Plan made the Representative

16

a trustee, and vested in the beneficiaries the rights granted to beneficiaries under the common law of trusts. The Representative may have contractually committed herself to provide periodic reports to the signatories, but the Appointment Agreement does not address her duty to account, or limit it.

In fact, the Appointment Agreement imposes an independent basis to require an accounting. Under Article III(b), the Representative must "maintain and reconcile all trust accounts in accordance with applicable state law and the Rules of Professional Responsibility." The Representative is a New York law firm, and the Representative and the attorneys that work for the Representative are subject to New York's Code of Professional Responsibility. Disciplinary Rule ("DR") 9-102, N.Y. COMP. CODES R. & REGS., tit. 22, § 1200.46 (1999), states that the attorney must advise the client or third person when she receives funds or property in which the client or third person has an interest, DR 9-102(C)(1), safeguard those funds and property, DR 9-102(C)(2), and "[m]aintain complete records of all funds, securities, and other properties of a client or third person coming into the possession of the lawyer and render appropriate accounts to the client or third person regarding them." DR 9-102(C)(3). The Representative received funds and property in which the Movants have an equitable interest as beneficiaries of the aforementioned trust, and they are

entitled to an accounting under the Disciplinary Rules and the Appointment Agreement.

Finally, the Representative charges the Movants with bad faith. This is a variation of the Representative's motion for sanctions that is denied for the reasons discussed below. In any event, and as noted, the Representative has collected over $10 million, and paid herself over $4 million. She has operated independent of the supervision of this Court – whose orders created her position and vested her with the authority she exercises – and it is appropriate for her to render an interim accounting at this time.

**B.    The Form of the Accounting**

Having concluded that the Representative is obligated to render an accounting, I turn to the form it must take. As explained in <u>Cobell v. Norton</u>, 240 F.3d 1081 (D.C. Cir. 2001):

> It is black-letter trust law that "[a]n accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception." <u>Engelsmann v. Holekamp</u>, 402 S.W.2d 382, 391 (Mo. 1966); <u>see also</u> BLACK'S LAW DICTIONARY (7th ed. 1999)(defining accounting as "the report of all items of property, income, and expenses" prepared by the trustee for the beneficiary). Under traditional equitable trust principles, '[t]he trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out." <u>White Mountain Apache Tribe</u>, 26 Cl. Ct. at 449.

18

240 F.3d at 1103.


The law does not prescribe a particular form, but related areas of New York law offer guidance.  For example, the New York Surrogate's Court Procedure Act includes official forms governing the accounts of executors and administrators (Official Form No. 12), accounts of trustees (Official Form No. 13), and accounts for executors where trust involved (Official Form No. 14.)  Each follows a similar format.  They consist of a series of statements or schedules that summarize the increases and decreases to the principal and income as well as general trust matters.  Thus, the trustee must, <u>inter alia</u>, identify the principal received, the administrative expenses either accrued or actually paid from the principal, any distributions of principal, any principal remaining on hand, as well as statements concerning the collection and distribution of income.  The accounting also contains a single page that summarizes each of the schedules and an affidavit by the trustee.


The HANDBOOK FOR CHAPTER 7 TRUSTEES, which is published by the Executive Office of United States Trustees and is available on the Department of Justice's web site, dictates the form of the trustee's final report, and calls for similar information.  <u>See</u> HANDBOOK FOR CHAPTER 7 TRUSTEES, dated July 1, 2002, at ¶ S.1, <u>available</u>

at http://www.usdoj.gov/ust/library/chapter07/ch7   lib.htm.  The
final report must, _inter alia_, describe the disposition of each
estate asset and all cash receipts and disbursements.  The trustee
may use existing forms to report these events, and these events
are, therefore, also presented in the form of schedules.  _See_ _id._
At a minimum, therefore, an accounting should be contained in a
single document consisting of schedules that clearly identify all
property and income that came into the trustee's hands, all
payments and distributions made therefrom, and what remains on
hand.

Although the Representative has provided a great deal of
information, she has not included it in a single document or set of
documents that clearly spell out this information.  Instead, the
Representative's productions have been spread out over time and
included in several submissions.  In addition, her "accounting"
does not speak as of a specific date.  Despite these shortcomings,
it should be relatively easy for her to adapt her existing
productions, which have already been presented in the form of
various schedules, into a more coherent format.  Furthermore, given
the passage of time, she should update the information that she has
already provided.

Accordingly, the Representative is directed to file an interim

accounting as of April 30, 2005, generally in the format of
Official Form No. 13 of the N.Y. Surrogates Court Procedures Act.
The interim accounting should include at a minimum, and subject to
the discussion later in this opinion, separate schedules that
identify the principal received, paid and accrued legal fees, other
administrative expenses that have been paid or have accrued,
distributions of principal, and income, expenses and distributions
relating to any investments, such as interest on bank deposits.
The accounting should also include a summary page and a
verification.   Following the rendition of the accounting, the
Movants or any other unsecured creditor will have the opportunity
to file formal objections, and if appropriate, seek to surcharge
the Representative.

## C.    Other Issues

While the Representative must still file an accounting, the
parties have already briefed several issues that are ripe for
resolution.   In addition, they have identified other matters that
should be highlighted in the accounting, if only to focus the
subsequent proceedings.

### 1.    Attorney's Fees

The Movants challenge the Representative's legal fees and many
of her expenses.  They also argue that the Court should require fee

21

applications before she is permitted to pay herself any more fees.
While they appear to question all of the legal fees, they find the
hourly-based compensation the most troubling.  The Representative
responds that she was not required to seek Court approval for her
fees and expenses under the Appointment Agreement.

The Representative is correct, but that does not immunize the
fees from review.  The Movants' objections directed at the hourly-
based compensation arrangement and wasteful litigation go directly
to the Representative's duty of loyalty and implicitly charge her
with improper self-dealing.  The Representative hired herself as
her own attorney, and in part, earns hourly-based compensation for
the time spent on matters she alone decides to pursue.  The more
she litigates the more she earns, and the less that remains for the
beneficiaries.  For this reason, a trustee cannot ordinarily hire
her own professional firm because her personal interests may
conflict with those of her <u>cestui qui</u> trust.  <u>See</u> <u>Palm Coast,</u>
<u>Matanza Shores Ltd. P'ship</u>, 101 F.3d at 258.  The only reason a
bankruptcy trustee can retain her own firm as her lawyer or
accountant is because the Bankruptcy Code expressly allows it.  <u>Id.</u>

It does not automatically follow that the Representative must
return her legal fees.  The Committee, acting as the representative

22

of all of the unsecured creditors, selected the Representative, and authorized her, through the Appointment Agreement, to act as her own counsel.  Her selection as counsel was, therefore, arguably made with the consent of the beneficiaries.  But even where the beneficiaries consent after full disclosure by the trustee to self-dealing, the trustee must still demonstrate the reasonableness and fairness of the amounts she received.  Morrissey v. Curran, 650 F.2d 1267, 1274 (2d Cir. 1981); RESTATEMENT (SECOND) OF TRUSTS § 170, cmt. w (1959).  See generally IIA SCOTT ON TRUSTS § 170.25, at 436.

Accordingly, the supervising court must closely scrutinize any transactions touched by this potential conflict, and the trustee has the burden of proving their fairness.  Here, the Representative, as trustee, paid a significant portion of the trust assets to the Representative, as attorney.  A trustee must account for the payment of all administrative expenses, and where the trustee is the recipient of those payments, the need for an accounting is even more compelling.

For this reason, the Representative's argument that the Court cannot review her fees in the absence of a bona fide dispute lacks merit.  Furthermore, the Movants have identified several bona fide disputes concerning her legal fees.  The Representative charged the

23

estate for claims reconciliation work, a task that included the Noteholder Objection. The Movant's argue that the fees generated by the Noteholder Objection were inflated because the Representative made meritless arguments under 11 U.S.C. § 510(b) that she eventually abandoned. Moreover, she failed to perform a proper investigation before arguing that First Union's claims were "Old Equity Interests" under the Plan. (Amended Accounting Motion, at ¶ 45.) Indeed, the Court voiced a similar criticism of the Representative's pre-objection investigation. See In re Teligent, Case No. 01-12974, slip op., at 4-5 n.3 (Bankr. S.D.N.Y. Dec. 6, 2004) (ECF Doc. # 2157).

The Movants also argue that the Representative filed other, unnecessary claims objections. First, she moved to reduce and allow relatively de minimis claims. (Amended Accounting Motion, at ¶ 47.) The projected distribution to unsecured creditors is no more than one-third of one percent, and Movants contend that the legal fees generated by these objections far outweigh any benefits. Second, the Movants question the purpose of filing objections to the claims identified by Teligent in Schedule F. Many of the scheduled claims were superseded by filed claims. In addition, they presumably had merit since Schedule F reflected the information in Teligent's books and records. (See id., at ¶ 48.)

24

This is not intended to be an exhaustive listing of potential areas of dispute as the information to be disclosed may reveal others.  As part of the accounting, the Representative is directed to file a separate schedule or sub-schedule containing contemporaneous time records pertaining to all hourly fees paid or payable by the estate.

## 2.  Other Expenses

The Movants have also challenged certain categories of other expenses charged against the trust.  The Appointment Agreement allowed the Representative to reimburse herself for her reasonable and necessary expenses.  In the case of the Chapter 5 Causes of Action,

> Such reasonable and necessary expenses shall include, but not be limited to, postage, copies, court costs relating to commencement of Adversary Proceedings, travel related expenses to be incurred with respect to the pursuit and/or investigation of such claims, accounting fees relating to reconciliation of the trust accounts, document retrieval, copying and storage, and other expenses directly relating to the pursuit of the Chapter 5 Causes of Action, the reconciliation of General Unsecured Claims and the distribution of the proceeds of the Chapter 5 Causes of Action but not [the Representative's] general overhead.

(Appointment Agreement, Art. II(a)(3).)  This definition was not included in the section of the Appointment Agreement authorizing the Representative to recover "reasonable expenses" incurred in connection with the claims-related work.  (See id., Art II(b).)

25

The definition of "reasonable and necessary expenses" is ambiguous.  On the one hand, it includes a "catch-all" phrase that allows reimbursement for "other expenses directly relating to the pursuit of the Chapter 5 Causes of Action."  On the other hand, it expressly excludes "general overhead."  The Appointment Agreement does not define "general overhead," but the phrase is one familiar to bankruptcy practitioners.  Paragraph (b)(5)(vii) of the United States Trustee's <u>Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses Filed Under 11 U.S.C. § 330</u> states that nonreimbursable overhead

> consists of all continuous administrative or general costs incident to the operation of the applicant's office and not particularly attributable to an individual client or case. Overhead includes, but is not limited to, word processing, proofreading, secretarial and other clerical services, rent, utilities, office equipment and furnishings, insurance, taxes, local telephones and monthly car phone charges, lighting, heating and cooling, and library and publication charges.[7]

The parties may or may not have intended "general overhead" to have the same meaning.  Accordingly, the meaning of "general overhead" and the scope of reimbursable expenses incurred in connection with claims-related work are two questions that can only be resolved after a trial.

---

[7]    The Guidelines are reprinted at 28 C.F.R. Part 58, Appendix.

### a.    Overtime and Office Supplies

Exhibit C to the <u>Savage Affidavit</u> consists of a 151 page summary of expenses incurred between November 15, 2002 and October 13, 2004.    The entries apparently correspond to numbered "Timeslips," and reflect various categories (<u>e.g.</u>, copying, telephone, travel, <u>etc,</u>.).    They are not segregated by category or filed in a searchable format, making it virtually impossible to aggregate the various categories of expenses.

A cursory review of the entries nevertheless gives one pause. One of the categories is "other expenses."  In some instances, this represents charges for overtime, (<u>Savage Affidavit</u>, Ex. C., at 3), although there is also a specific category called "overtime." (<u>Id.</u>, at 33.)  Sometimes, "other expenses" seems to refer to office supplies.    (<u>Id.</u>, at 2  (Timeslip # 313)("windowed envelopes")). Another category reflects charges for "temporary office staff." (<u>Id.</u>, at 40.)

As noted, such charges generally fall under the rubric of overhead.    Furthermore, the entries do not justify the reasonableness or necessity of the overtime.  For example, this Court's own <u>Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases</u>

27

(the "Court's Amended Guidelines"), contained in section F(5) of

General Order M-150, dated April 19, 1995, states as follows:

> No overtime expense for non-professional and paraprofessional staff shall be reimbursable unless fully explained and justified. Any such justification must indicate, at a minimum, that (i) services after normal closing hours are absolutely necessary for the case and (ii) the charges are for overtime expenses paid.[8]

Accordingly, the Representative's accounting must contain a

schedule that categorizes the paid and unpaid administrative

expenses. Many pertain directly to litigation, such as court fees,

expert witness fees, case-related travel and transcripts, and

should not engender problems. Others, including secretarial

services, overtime, local telephone calls, office supplies and

other office expenses sound like overhead and do.


### b. Meals

Exhibit C to the Savage Affidavit also includes several

charges for meals. (See, e.g., pp. 14 ($70.45), 48 ($60.18), 62

($79.26).) "Meals" are not specifically mentioned in the

Appointment Agreement, and section F(6) of the Court's Amended

Guidelines authorizes reimbursement for daytime meals only if "the

individual is participating, during the meal, in a necessary

---

[8]    General Order M-150 is accessible through the Court's web site.

28

meeting respecting the case." These entries require further explanation.

**D.    The Representative's Motion for Sanctions**

An inevitable by-product of the animosity between the parties is cross-motions for sanctions. After the Movants served their Initial Accounting Motion, the Representative responded on or about January 3, 2005, by sending the Movants a thirty-six page "safe-harbor" motion. (<u>See</u> <u>Representative's Initial Objection</u>, at ¶ 26.)

Before the twenty-one day "safe harbor" period had expired, the Movants reviewed the Representative's January 10th document production, withdrew some of the allegations, added new ones, and filed their Amended Accounting Motion on or about January 21, 2005. According to the Movants, the Amended Accounting Motion "substantially narrows the scope of Movant's requests and is deemed to supercede the Initial Motion." (<u>Amended Accounting Motion</u>, at p. 2 n.1.) One week later, the Representative served the sanctions motion now before the Court. (<u>The Unsecured Claims Estate Representative's Motion Under Federal Rule of Civil Procedure 11 [etc.]</u>, dated Jan. 28, 2005 ("<u>Sanctions Motion</u>")(ECF Doc. # 2209).) The Sanctions Motion was never provided to the Movants prior to its

filing on January 28th.  As a result, the Representative did not afford a second "safe harbor" warning or a twenty-one day cure period.

The Representative alleges, in the main, that the two accounting motions contain blatant misrepresentations and were interposed to intimidate, harass, and threaten the Representative as retaliation for the Noteholder Objection and the appeal that followed.  (_Id._, at 24-25.) The Movants respond that the Sanctions Motion is procedurally improper and lacks merit.  (_Objection/Answer of [Movants] to the Unsecured Claims Estate Representative's Motion for Sanctions Under Rule 9011 and 28 U.S.C. § 1927_, dated Mar. 11, 2005 ("_Movant's Objection_"), at 13-17.)  In addition, they seek sanctions against the Representative for making the Sanctions Motion.  (_Id._ at 17-18.)

### 1.    The Standards Under Rule 9011

With certain exceptions, every petition, pleading, written motion or other paper presented to the court must be signed by the party's attorney, and if the party is _pro se_, by the party himself. FED R. BANKR. P. 9011(a).  By signing the accounting motions, the Movants attorneys made certain representations.  Under Bankruptcy Rule 9011(b),

30

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Rule 9011 parallels Rule 11 of the Federal Rules of Civil Procedure, and the jurisprudence under Rule 11 informs the interpretation and application of Bankruptcy Rule 9011. In re Highgate Equities, Ltd., 279 F.3d 148, 151 (2d Cir. 2002). Rule 11 "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." FED. R. CIV. P. 11 advisory committee's note (1993). The decision whether to impose sanctions for a violation of Rule 9011 is discretionary, 10 ALAN N. RESNICK, HENRY J. SOMMER & LAWRENCE P.

KING, COLLIER ON BANKRUPTCY ¶ 9011.07[1], at 9011-19 (15th ed. 1979),
and if exercised, sanctions may be imposed against the law firm as
well as the attorney within the firm that signed the pleading.
FED. R. BANKR. P. 9011(c)(1)(A).


     Federal Bankruptcy Rule 9011, like Rule 11 of the Federal
Rules of Civil Procedure, includes a "safe harbor" provision.  Rule
9011(c)(1)(A) states, in pertinent part:

> A motion for sanctions under this rule shall be made
> separately from other motions or requests and shall
> describe the specific conduct alleged to violate
> subdivision (b). It shall be served as provided in Rule
> 7004.  The motion for sanctions may not be filed with or
> presented to the court unless, within 21 days after
> service of the motion (or such other period as the court
> may prescribe), the challenged paper, claim, defense,
> contention, allegation, or denial is not withdrawn or
> appropriately corrected . . . .

     The purpose of the "safe harbor" provision is to give the
alleged violator of Rule 9011 the chance to avoid the sanction by
withdrawing the offending pleading.  See Hadges v. Yonkers Racing
Corp., 48 F.3d 1320, 1327-28 (2d Cir. 1995).  Two propositions
follow.  The movant cannot seek sanctions for pleadings (or parts
of pleadings) that she has not given the alleged violator the
opportunity to withdraw.  Conversely, the alleged violator should
not be able to force the movant to send seriatim "safe harbor"
draft motions simply by withdrawing the first pleading and

32

reasserting the same objectionable material in a second pleading.

### 2.    The Objective Reasonableness of the Accounting Motions

The impetus behind the Initial Accounting Motion was the concern about legal fees and expenses and the lack of oversight. Specifically, the hourly based fee arrangement created a "clear conflict of interest between the interests of the Representative and the constituency whom it purportedly represents . . . exacerbated by the fact that, at present, there are absolutely no controls over the Representative." (Initial Accounting Motion, at p. 3.) In short, she had engaged in wasteful litigation. As examples, the Movants stated that all or most of the Representative's objections to the Indenture Trustee's claims were unreasonable, unnecessary and meritless. In addition, the Representative's motion to reclassify certain claims made no economic sense in light of the projected distribution in the case. Finally, the Representative had filed over 100 adversary proceedings which she thereafter dismissed, generating over $15,000.00 in unnecessary filing fees. (Id., at ¶ 18.) The Movant's sought, inter alia, to force the Representative to account for her receipts and her fees. The Movants also sought, apparently in the alternative, to appoint an oversight committee to supervise the Representative, or to remove her.

33

The Amended Accounting Motion, which followed the Representative's January production of two boxes, dropped several of the old charges, but also raised new ones. The Amended Accounting Motion repeated the wasteful litigation claim, (Amended Accounting Motion, at ¶¶ 45-49), and also pointed to an apparent discrepancy in the information supplied by the Representative after the Initial Accounting Motion, or to specific improper charges against the trust funds held by the Representative. (See id., at ¶¶ 24-28, 30-33, 42-44.)

The Representative never sent the Movants a second "safe harbor" motion directed at the new allegations, and instead, filed the Sanctions Motion – different in many respects and twenty pages longer than the first "safe harbor" motion – one week later. As a result, the Movants were never afforded an opportunity to withdraw or modify the new allegations, and sanctions would not be appropriate on this basis. On the other hand, she did not have to send another "safe harbor" motion addressing the general wasteful litigation claim that was repeated in the Amended Accounting Motion.

Procedural disputes aside, however, neither accounting motion was frivolous within the meaning of Rule 9011. The Court has already acknowledged the potential conflict that arises when a

34

trustee hires her own professional firm.  The Movants have the
legal right to insist on an interim accounting, and the
circumstances certainly warrant it.  Furthermore, their concerns
about wasteful litigation are reasonable for the reasons discussed
above, and the accounting motions provided an appropriate method of
reviewing the amounts that the Representative paid to herself for
legal services and expenses.

Similarly, the new allegations raised in the Amended
Accounting Motion have a reasonable basis.  The Representative's
January production did not moot the Movants' demand, but instead,
triggered new questions.  As discussed, the Representative used
trust funds to pay what appear, at least on the surface, to be
"general overhead."  Furthermore, she charged meals, sometimes
expensive ones, to the trust.  As a result, the Representative has
been directed to file an accounting, contained within in a single
document, which includes schedules that clarify these and other
expenditures.

The foregoing discussion disposes of many of the specific
allegations attributed to the Movants as frivolous in the Sanctions
Motion.  (Sanctions Motion, at 29-34.)  These include Allegations
"a" (wasteful litigation), "b" (objecting to de minimis claims),
"d" (frivolous objection to Noteholder claims), "h" (dispute

35

regarding Representative's fees) and "k" (general wastefulness of the <u>Representative's actions</u>)[9].    In addition, the <u>Amended Accounting Motion</u> did not repeat Allegations "c" (unnecessary filing of over 100 adversary proceedings), "f" (conflicts in connection with interest accruing on trust funds), "g" (number of avoidance actions still pending), "i" (wasteful actions against the secured lenders and Reorganized Teligent), "j" ("safe-harbor" notice regarding the Noteholder Objection) and "l" (request to rule on oversight committee).    These have, therefore, been withdrawn.

Lastly, the subject matter referred to in Allegations "m," "n," and "o" first appeared in the <u>Amended Accounting Motion</u>. Hence, the Representative never gave the Movants the opportunity to withdraw them, and they cannot form the basis of a sanctions motion.    Furthermore, the statements are not sanctionable.    The first two – "m" and "n" –    are trivial.    According to Allegation "m," the Movants said that the Representative did not produce all bank statements.    (<u>Sanctions Motion</u> at 34.)    According to Allegation "n," they said that "the documents produced 'can best be

---

[9]    In some cases, the Representative mischaracterized the Movant's papers. For example, the Movant's did not say that the prosecution of the avoidance claims on a contingency fee basis or the motion to <u>expunge</u> claims was wasteful; they complained about frivolous objections to the Noteholders' claims and other objections that sought to <u>reduce</u> <u>de</u> <u>minimis</u> claims. (<u>See</u> Allegations and Responses "a" and "b") (<u>Sanctions Motion</u>, at 29.) Furthermore, the Movant's did not charge the Representative with "generally" wasteful actions. (<u>See</u> Allegation and Response "k") (<u>Sanctions Motion</u>, at 33.) They made very pointed allegations regarding waste.

36

described as incomplete, disorganized mess and do not answer the
questions raised by the Movants.'" (<u>Id.</u>)

The last Allegation, "o," is more serious.  According to the
Representative, the Movants accused her of failing to account for
$1.15 million.  (<u>Id.</u>)  The Representative conceded, however, that
the Movants' contacted her on January 27, 2005, to ask questions
about the January production, and made an appointment to come to
her office on February 1st to review documents.  (<u>Id.</u>, at 34-35
n.39.)  Instead of waiting to see if this new allegation could be
resolved, she filed the Sanctions Motion the next day.

Had she waited, it would have been resolved.  As noted above,
her subsequent February production satisfied the Movants that she
had accounted for all of the funds.  As a consequence, they no
longer press that argument.

This leaves Allegation "e," which concerns the frivolous
nature of the Representative's appeal from the order overruling the
Noteholder Objection.  My review of the Initial Accounting Motion
reveals only one comment on this point.  It states that the
Indenture Trustee as well as Aspen "demanded that the
Representative dismiss the appeal pursuant to Rule 9011 of the
Federal Rules of Bankruptcy Procedure."  (<u>Initial Accounting</u>

37

<u>Motion</u>, at ¶ 20 n.11.)  The statement is true, and does not provide a basis for sanctions.


    **2.    The Improper Purpose**

    The Representative also contends that the accounting motions were filed for the improper purpose of intimidation and harassment. A court cannot impose sanctions under the "improper purpose" provisions of Federal Bankruptcy Rule 9011(b)(1) if the pleading is nonfrivolous and the pleader obtained a measure of relief.  <u>See Sussman v. Bank of Israel</u>, 56 F.3d 450, 458-59 (2d Cir.), <u>cert. denied</u>, 516 U.S. 916 (1995).  Here, the Court has already concluded that the accounting motions were not frivolous, and has directed the Representative to file accounting.  Accordingly, sanctions are not warranted under Federal Bankruptcy Rule 9011(b)(1).


    **3.    Other Grounds For Sanctions**

    Finally, the Representative seeks sanctions under 28 U.S.C. § 1927, which states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

    The motion is denied.  Initially, whether the bankruptcy court is a "court of the United States" is debatable.  <u>Compare</u> 28 U.S.C.

38

§ 451 (defining "court of the United States" to include the Supreme
Court, courts of appeals, district courts, the Court of
International Trade and any other court "the judges of which are
entitled to hold office during good behavior") _with_ 28 U.S.C. § 151
(stating that a bankruptcy judge is a judicial officer of the
district court) _and_ 28 U.S.C. § 152(a)(1)("Bankruptcy judges shall
serve as judicial officers of the United States district court
established under Article III of the Constitution.")  In any event,
for the reasons stated, the accounting motions did not multiply the
proceedings, much less unreasonably or vexatiously.

**E.    The Movants' Request For Sanctions**

The Movants have asked the Court to impose sanctions against
the Representative for making the Sanctions Motion.  Rule
9011(c)(1)(A) authorizes the Court, if warranted, to "award to the
party prevailing on the motion the reasonable expenses and
attorney's fees incurred in presenting or opposing the motion."  In
_Nakash v. United States Dep't of Justice_, 708 F. Supp. 1354
(S.D.N.Y. 1988), the district court suggested a less forgiving
standard when considering sanctions against the unsuccessful
sanctions movant.   It observed that a court reviews the
justification for the targeted motion under a lenient standard, and
hence, the Rule 11 movant must examine the targeted document under
this "very forgiving" standard.   _Id._ at 1368; _accord_ GEORGINE M.

39

VAIRO, RULE 11 SANCTIONS: CASE LAW, PERSPECTIVES AND PREVENTIVE MEASURES §
6.06[d], at 383-84 (3d ed. 2004). Consequently, the sanctions
movant must establish that the targeted motions were "so weak that
reasonable attorneys could not have disagreed on their eventual
outcome." Nakash, 708 F. Supp. at 1369.

The Representative cannot meet this standard. A reasonable
attorney would expect that a beneficiary's motion to compel an
accounting by a trustee who had collected over $10 million and paid
herself over $4 million in legal fees and expenses was well-founded
and had a fair prospect of success. Nevertheless, I decline to
impose sanctions against the Representative on this occasion, which
would only pour fuel on this incendiary litigation. Instead, the
parties should tone down the level of animosity and behave
professionally, mindful of their duties to their clients and the
Court.

## CONCLUSION

The Representative is directed to file an interim accounting,
following the format described above, within thirty days of this
opinion and order, and serve a copy on the Movants, Reorganized
Teligent and the Secured Lenders. The accounting should "speak" as
of April 30, 2005, and the accounting and schedules should, if
possible, be filed in a searchable format, rather than as scanned

40

documents, to facilitate the analysis of the data.

Any party in interest may file objections to the accounting within thirty days of the date that the accounting is filed.  The objections should follow the form of a complaint, and each objection should be listed as a separate count.  After the objection period has closed, the parties should contact chambers to arrange a conference to schedule further proceedings.

The Court has considered the parties' other arguments, and concludes that they lack merit.

So Ordered.

Dated     New York, New York
          May 18, 2005

                    /s/ _Stuart M. Bernstein_
                    STUART M. BERNSTEIN
              Chief United States Bankruptcy Judge

41